George Mittman, Appellee, v. O. C. Farmer, et. al.,
Appellants.

S. G. Stein, Appellee, v. O. C. Farmer, et al., Appellants.

**Drainage:** ESTABLISHMENT OF DISTRICT: REVIEW OF ORDER.   Ordinarily it is the rule in equitable cases that the findings of the trial court will be given weight on appeal; but this rule does not apply with the same force on an appeal from a decree setting aside an order of a board of supervisors establishing a drainage district, as the action of the board in such cases is in a large measure legislative; and this is especially true where the board acted upon the advise of a competent engineer, and personal inspection of the proposed district.   In such cases which are subject to review, the courts should be slow to annul their order.

**Same:** PUBLIC BENEFIT: EVIDENCE.  Wherever it appears that agricultural lands, because of their location and surface conditions, habitually collect surface water to an extent rendering them unfit for cultivation the drainage of such lands should be considered a public benefit; and the fact that some of the lands within a proposed district will not be benefitted as much as other lands does not justify setting aside an order of the board establishing the district, as that is a matter which can be adjusted in making the assessments.   The evidence in the instant case is held insufficient to justify the court in setting aside the order of the board establishing the district.

**Same:** EXCESSIVE COST: EVIDENCE.   The evidence in this action is reviewed and held to show that the cost of the drainage system and its maintenance, as proposed, would not be excessive, when compared with the benefits to be received.

**Same:** ESTABLISHMENT OF DISTRICT: SUFFICIENCY OF PETITION: STATUTES.   The act of the 34th. General Assembly amending section 1989-a49 of the Code Supplement, requiring a petition signed by one third of the land owners of the district before a pumping station can be established in connection with the district, does not apply to the organization of a district for which the petition had been filed, commissioners appointed and objections filed before the amendment became effective, although the final order establishing the district was not made until afterwards; as the amendment provided that it should not affect pending litigation or proceedings under the law amended, which includes any of the steps taken in the proceeding before the board.

**Same:** EXTENT OF DISTRICT: LANDS IN ANOTHER DISTRICT: ASSESS-
MENT OF BENEFITS. Where a proposed drainage district included lands of an existing district which lay outside the limits of a city, but not those within the city limits similarly situated, the fact that the lands within the city not included were benefited would not be ground for setting aside the order of the board establishing the district; as they could be included later if found to be substantially benefited. Nor would the fact that lands within the city were not included be ground for excluding other land in the old district; as the same would be assessed according to benefits after taking into consideration the value of the old improvements.

**Same:** EXTENT OF DISTRICT: DISCRETION OF BOARD. In the establish-
ment of a drainage district having a city within the watershed the fixing of the boundary of the district at the city limits where the benefits were tangible, and omitting lands within the city limits and subject to the sanitary requirements of the city, was within the legislative discretion of the board acting upon the report of the engineer.

*Appeal from Muscatine District Court.*—HON. L. J. HORAN, Judge.

SATURDAY, SEPTEMBER 20, 1913.

PLAINTIFFS, appellees here, appealed to the district court from an order of the boards of supervisors of Muscatine and Louisa counties establishing drainage district No. 13, including a pumping station and the maintenance thereof. The two apeals were tried together in the district court. There was a decree in favor of plaintiffs, and the order of the joint board establishing the district was annulled. Defendants appeal.— *Reversed.*

*J. J. Seerley* and *H. O. Weaver* and *W. H. Hurley,* for appellants.

*J. F. Devitt, C. A. Carpenter* and *Carskaddon & Pepper,* for appellees.

PRESTON, J.—The facts are substantially that on March 10, 1910, there was filed with the county auditors of the two

counties a petition signed by forty of the one hundred and seventy-four landowners in the district, asking that the boards of supervisors establish a drainage district, which would include lands within both counties, and a pumping station. March 11, 1910, the boards met in joint session, appointed two commissioners as provided by law; the two commissioners appointed an engineer, and on August 13, 1910, a report was filed, recommending the establishment of a district, including a pumping station, and specifying the lands which should be included within the proposed district, and showing the estimated cost of the improvement and maintenance of the pumping station. This report shows the area of the watershed to be 53,480 acres, 29,440 acres in Muscatine county, and 24,040 in Louisa county.

The commission further found that the lands benefited would be 15,774 acres in Muscatine county and 14,208 acres in Louisa county, or a total of 29,982; that the acreage liable to be affected by the backwater in Muscatine slough during seasons of protracted high water in the Mississippi river, under present conditions, is approximately 5,539 acres in Muscatine county and 10,352 in Louisa county. Objections were filed by different landowners and at different times; some of these objections were filed before the board as early as April and May, 1910.

Evidence was offered and hearings had before the board, and the district was established October 25, 1911, as recommended by the engineer, and was named the Muscatine-Louisa county district No. 13. A time was fixed for filing claims for damages; but the record does not show how many or the amount of these, and it is stated there is no controversy as to them. Other proceedings were had and orders made which are not now material.

A contour line, three feet above high water, was used as a basis for the boundary line of that part of the district north of the Hoffman levee, and each forty-acre tract, any portion of which contained land lower than this three-foot

contour, was included within the boundary of the district. At the south end the boundary was taken from the levee line to the high-water line at the bluffs. The established drainage district begins at the south limits of South Muscatine, then extends in a southerly direction, following the old bed of the Muscatine slough to its junction with the Mississippi river, then south to the mouth of the Iowa river. The entire length of the district is twenty-six miles. Originally Muscatine slough had an inlet from the Mississippi river at what is now South Muscatine. It runs in a southwesterly direction for some miles, thence south, thence southeast to Port Louisa, where it has an outlet into the river. Many years ago a levee was constructed along the west bank of the Mississippi to, or nearly to, Port Louisa. About 1894 the Hoffman levee was built from the south end of the old levee near Port Louisa west to the bluffs to protect the land from the overflow of the Mississippi.

The land between Muscatine slough and the river is called Muscatine Island. The island varies in width; it is about four and one-half miles wide at its widest part, near the town of Fruitland, narrowing to about a mile at its lower end

The lands in the district will be benefited more or less, depending upon the elevation and location of the various tracts. The width of the district varies from one and one-half to four miles. The western boundary extends nearly to the Mississippi bluffs, which extend in a southern and southeasterly direction until they merge with the bluffs of the Iowa river. The eastern boundary of the district may be said to be the banks proper of the Mississippi river, except at the north portion, where, for a distance of ten or twelve miles, the sand ridges or higher lands extend along the river banks. These higher lands just referred to are not included in the district. The soil along the bed of the Muscatine slough is a rich, black deposit, varying in extent and depth. The soil west of the slough is similar. The land in the southern part

of the district is level. Some of the land in the district is made up of sandy ridges and slashes, the heavier soil being in the slashes, and extending towards the general outlet of the slough; this is particularly so as to some of the land around Fruitland, where the soil in places is thin and sandy. The swales are called slashes by the witnesses generally, though some of them refer to ponds as slashes. Before an effort was made to reclaim the lands, most of them in the district were, and those in the southern part are now, low, wet, and subject to overflow. All of the rich, black soil in the district needs complete drainage. Some of it is in some degree cultivated; but much of it is useless for want of reclamation.

The levees before mentioned have been of benefit to the landowners, but in times of high water do not afford adequate protection of the lands which they inclose. When the Mississippi river is high, the outlet pipes in the levees must be closed, and, there being no outlet for the water within the district, it rises to such an extent as to render a portion of the lands in the upper district unsuitable for cultivation. There is some conflict in the evidence as to how far north the backwater will reach. Some of the witnesses say it extends to the Muscatine city limits, others think not farther than to Vail's land, which is five or six miles north of the Hoffman levee. There are swales north of Vail's land, where the elevation is lower than at Vail's.

The extreme high-water mark of the Mississippi is something more than eighteen feet; when a stage of thirteen feet is reached, lands inside the levees are flooded. When the waters recede, lakes and ponds are left here and there over the district. The lower part of the district, south of Port Louisa, containing about 6,000 acres, is also reclaimed by the proposed improvement. Only a small part of this land can now be cultivated even in dry seasons. While but forty of the individual landowners in the district have signed the petition for the improvement, about seventy-five per cent of the acreage favor drainage.

When the tax for this improvement is finally levied, the lands of the parties who have filed this contest will, in all probability, bear but a small part of the burden, and only such an amount as their lands are benefited. The heavier burden will fall on the lands which cannot now be cultivated, and which will be more substantially benefited. A large district of very rich land, which is now almost useless, will be reclaimed. The improvement contemplates a pumping station at Port Louisa. It is not claimed by objectors that the pumping station is not feasible. The objections to the pumping station are that the cost of construction and maintenance will be burdensome, and that there were not a sufficient number of signers to the petition.

Several years ago drainage district No. 3 was organized. This district included low-land within the city limits of Muscatine, and extended in a southwesterly direction to the county line. The proposed district No. 13 includes so much of No. 3 as is south of and outside the city limits. It is not objected that the boards did not have authority to include a part of No. 3; but the objections are that the lowlands in South Muscatine will be benefited and should be included in 13, and that the lands in No. 3 outside the city are not benefited and should not be included. Numerous objections were filed before the board and in the district court, among them that the drainage law is unconstitutional; that the lands of the objectors were all inclosed by levees, and had been so inclosed more than ten years; that the landowners outside of this district should have no voice in determining the improvements to be made within the district; because the notice to landowners was only by publication, and because the board did not have before them, when they took action, the report of the commissioners and engineer, as required by law. As to the last, it appears that this report was before the board. The other points just referred to are not argued, doubtless because some, if not all, of them had been heretofore determined. The trial court found that the district would not be for the public bene-

fit or utility, or conducive to the public health, convenience, or welfare; that the proposed improvement and the maintenance thereof is excessive and a greater burden than should be properly borne by the land alleged to be benefited thereby; that the joint boards did not have jurisdiction to order and establish a pumping plant in connection with said improvement, for the reason that the petition asking for said improvement was signed by less than the required number of owners of lands supposed to be benefited, and that, in establishing drainage district No. 13, the joint boards by their order included in said district a portion of district No. 3, and that such action of the boards was inequitable and unjust; that the said boards improperly excluded a part of said district No. 3 to avoid the objections of the owners of land in the part so excluded. These are the propositions argued, and we shall now proceed to consider them in their order.

I. As to the first point, it is contended by appellees that the action of the board is reviewable by the district court on appeal; that the cause is triable *de novo;* and

1. DRAINAGE: establishment of district: review of order.

that the decision of the trial judge, he having seen and heard the witnesses, should have weight. This is the rule in equitable actions ordinarily. *Cheadle v. Roberts,* 150 Iowa, 639, 642, and numerous other cases.

It is also contended that the trial court correctly decided the question under the evidence. Appellant's contention at this point is that the action of the board is legislative in its character; but even if this is not so that the finding was contrary to the evidence. We think the rule of the *Cheadle case, supra,* and like cases in equity, ought not to apply so strongly in a case of this character as in the ordinary action triable *de novo.* It is true that the trial court saw and heard the witnesses, and is in a better position than we can be to determine the conflict in the evidence. But in this case, and usually in this class of cases, the evidence of the witnesses is a description of the character of the land, and the soil, swales, ponds, water courses, ditches,

levees, and the like. The engineer went over the ground, and took elevations of the different tracts. The members of the board made a personal inspection of the entire district, and could see for themselves what the witnesses attempted to describe. The engineer and the members of the board under such circumstances are in a better position than the trial court to determine the necessity and propriety of establishing a drainage district, and the boundaries thereof. Especially is this true where so much depends upon the report of the engineer and the action of the board. Without discussing the statute or the cases holding that the board of supervisors may act only on the recommendation of a competent engineer, and that, on appeal from the action of the supervisors in proceedings for the construction of the drainage system, there must be the clearest kind of proof that the officers have acted without jurisdiction, or have abused the power conferred upon them to justify interference by the court, it will be sufficient to cite some of them. *Temple v. Hamilton County,* 134 Iowa, 706, 711; *Zinser v. Board,* 137 Iowa, 664, 665; *Hartshorn v. Wright District,* 142 Iowa, 72; *Shaw v. Nelson,* 150 Iowa, 559, 564; *Wood v. Hall,* 138 Iowa, 308, 322; *Laurence v. Page County,* 151 Iowa, 182, 196; *Focht v. Fremont County,* 145 Iowa, 130, 144. These cases, or some of them, also hold that upon appeal the court should reluctantly interfere with the action of the board. It was conceded on the trial that the engineer was competent. It appears from the evidence that he has had large experience in such matters, as an engineer, in planning and constructing drainage enterprises, some of which are similar to this, and as an owner of such lands as those included in this district. He was not a resident of the district, therefore not subject to local influence or feeling, and does not appear to have been partisan or biased.

Gathered from our prior cases, the holdings appear to be that the act of the board of supervisors in establishing the district is subject to review, but is partly judicial and partly in the nature of a legislative function. *Temple v. Hamilton*

*County,* 134 Iowa, 706; *Denny v. Des Moines,* 143 Iowa, 466; *Railway v. Monona County,* 144 Iowa, 171; *Focht v. Fremont County,* 145 Iowa, 130; *In re Dist. No. 3, Hardin County,* 146 Iowa, 564. In *Railway v. Monona County, supra,* 144 Iowa at page 176, it was said: ''The inclusion of the property within the boundaries of the district is  .  .  . an exercise of legislative power, which the courts cannot review or set aside.'' The rule was stated in *Focht v. Fremont County, supra,* 145 Iowa at page 144, as follows: ''The rule for such appeals has thus been stated: 'In view of the fact already mentioned that these duties are in large measure legislative in character, and the further obvious truth that the supervisors are on the ground where they can see and know the situation as no one else can see or know it from the written or printed testimony, we are of the opinion that the court should be very reluctant to interfere and set aside their order on the ground that the ditch is not a work of public utility, or its cost is a greater burden than the lands benefited should bear, unless the evidence in support of the objections is so clear as to render that conclusion unavoidable, and the burden of making such showing is on the party attacking the order.' ''

As applied to this case, then, the appellants, who were the objectors below, had the burden of showing that the proposed district was not a work of public utility, and that the cost is excessive and a greater burden than should be borne by the lands included therein. At least appellees cannot and do not claim the decisions to be more favorable to them than this. Did they so show?

As we have seen, the report of the engineer and the findings of the board are entitled to weight, and the district court should have been, and this court will be, reluctant to annul the order of the board.

II. First, as to whether the district would be for the public benefit or utility, and conducive to the public health,

convenience, and welfare. The law itself says that the drain-
age of surface water from agricultural lands
2. SAME: public benefit: evi-dence.    shall be considered a public benefit and con-
ducive to the public health, convenience,
utility, and welfare (Code Supp. Section 1989-a1) ; that is,
this is so when it is shown in a given case that lands, because
of their location and surface conditions, habitually collect
and retain surface water to such an extent as to unfit the ·
same for agricultural purposes. *Sisson v. Supervisors,* 128
Iowa, 442, 456. The engineer so found and reported, and,
further, that the lands affected will be increased in value
much more than the cost of the improvement.

The board of supervisors so found in the order estab-
lishing the district. It seems to us the character of the lands,
as stated generally in the statement of facts, is enough in
itself to show that these lands are such as to make this im-
provement one of public benefit. The fact is there is but little
if any evidence that the district should not be established.
Some of the objectors give it as their opinion that their lands
will not be benefited, and for that reason they should not be
included in the district, yet on cross-examination each one
admits, or the other evidence shows, that on substantially
every tract there is a slash, pond, or low place. It would not
be a sufficient reason for setting aside the establishment of the
whole district that some lands are not benefited as much as
others. Undoubtedly some of these lands will be benefited
more than others, and some of the landowners will be benefited
more than others. This is often so in cases of public im-
provements; but this is not a ground for doing away with
such projects. These matters will be controlled by the assess-
ments.

We have not taken the space to detail the evidence. We
have already described the situation in a general way. This
further may be said, that substantially all these lands are
subject to overflow. Some of the land is entirely useless;
much of that which is under cultivation is wet and sour at

planting time, resulting in failure or partial failure of crops at times. The lands in the old district No. 3 which have been included in No. 13 have been benefited to some extent by the old ditch; but they are drained into Muscatine slough, and will be further benefited by cleaning out and deepening the old ditch, and by taking the water away from below. All the lands are in Muscatine slough or drain into it. Some of the sandy lands towards the upper end of the district around Fruitland will not be greatly benefited perhaps but they are on the island near the slough, and have more or less wet land. When the assessments are made, objectors may have no cause for complaint. The subject was gone into to some extent on this trial, and there is some evidence that some of the land should not be assessed more than 25 cents per acre, while others should be $25 per acre.

The elevation of the land is not the sole test. Some of the objectors, testifying as witnesses, seem to have gone on the theory that, having rid their lands of the surface water by discharging it upon their neighbors' land, they would not be benefited by the proposed system, and should not be included in the district. But the proposed district is a comprehensive scheme to relieve all this large territory. These neighbors may need relief. If objectors are also benefited, they should contribute to the expense of draining the district. *Drainage District No.* 3, 146 Iowa, 564, 575.

The evidence shows that the project will be successful. Similar undertakings have been. There is some evidence to the contrary by witnesses whose lands are a considerable distance from the drainage ditches, and who have not tiled or connected up their lands. But there is no serious conflict on this proposition.

Appellees do not seriously contend that a drainage district is not needed. They, as witnesses, admitted that it is needed, but only claim that their lands would not be benefited. If this was true, they could be released. Code Supp. Section 1989-a46. This would not justify setting aside the order as

to the entire district. In our opinion, the evidence does not sustain the finding of the trial court on this proposition.

III.   The estimated cost of the improvement is $172,500; of this $110,000 is for the pumping plant, machinery, buildings, etc., and the balance for ditches, sluiceway, engineering, etc.   The average cost per acre would be about $10.90, and the average cost per acre for maintenance about fifty or sixty cents each year.   Appellees contend, and the court so found, that this is excessive and a greater burden than should be properly borne.   Much testimony was given showing the benefits to the district generally; that the lands would be increased in value from $50 to $75 per acre, some of it even more than that; that the rental values would be greatly increased; that larger and better crops would be grown on lands already under cultivation, or partially so; and that the lower lands now useless would be brought under cultivation.

3. SAME: excessive cost: evidence.

Not more than two or three of appellees' witnesses gave their opinion that it would be excessive as to the entire district. For the most part appellees' witnesses gave testimony that it would be excessive as to their own lands, and based it on the assumption that all the lands would be taxed $10 or $11 an acre for the construction of the ditches and pumping station, and fifty or sixty cents an acre for maintenance of the pumping plant.   'The witnesses so testifying were largely those on sandy lands in the northern part of the district, and the evidence was limited to such lands.   Appellees did not undertake to show by any of their witnesses that the cost of the work and maintenance would be a burden if properly distributed over the district according to benefits.   The engineer testified he could not give the estimated cost of the construction or maintenance for each forty acres, because the benefits to each tract would have to be determined on the basis from 1 to 100 per cent. of benefit before this could be determined.

As before stated, the cost of construction and mainte-

nance may range from 25 cents to $25 per acre. The lands of the objectors are not likely to be assessed heavily. We are of the opinion that the cost is not shown to be excessive or burdensome.

IV. It is conceded in argument that the proceedings for the establishment of this district were had under section 1989-a1, and following sections, of Code Supp. It is conceded that less than one-third of the owners of lands benefited signed the petition for the district and pumping station. It is contended by appellees that the pumping station could not be established, or, if established, could not be maintained, because the petition presented to the board did not contain that number of signatures. They say the statute (section 1989-a49, Code Supp., as amended by section 7, chapter 87, Acts of 34th G. A.) requires such a petition. This law took effect April 20, 1911, before the order of the board establishing the district, which was October 24, 1911. But the petition was filed March 7, 1910, and other proceedings were had in the matter before April 20, 1911. It is said by appellees that the saving clause in section 8 in that act does not apply; but they claim that if it does apply then, under chapter 69, Acts of 30th G. A., passed April 13, 1904, and now appearing as section 1989-a52 in the Code Supp., the signatures of fifty per cent. of the landowners were required.

4. Same: establishment of district: sufficiency of petition: statutes.

It will be well, perhaps, to here notice some of the dates which are material, and then take up the different acts of the Legislature bearing on the question. The petition for this improvement was filed March 7, 1910; a bond was filed on the same date. March 11, 1910, the boards met in joint session; the bond was approved and two commissioners appointed. April 4, 1910, at a meeting of the joint board another commissioner was appointed to fill a vacancy caused by sickness. The commission met April 14, 1910, and appointed a civil engineer as the third member. This commission reported on

August 13, 1910, and on September 10, 1910, a revised report
of the engineer was filed. Appellees, as objectors, were ap-
pearing before the board at some, if not all of the meetings.
Some of the written objections were filed before the board as
early as April and May, 1910. As before stated, the district
was established October 24, 1911, so that proceedings had been
pending in the drainage district more than a year before the
amendment requiring the signatures of one-third of the own-
ers of lands was passed by the Thirty-Fourth General As-
sembly. While chapter 69, Acts of 30th G. A., appears in
the session laws after chapter 68 of that session, it was first
passed. Chapter 69 was approved April 13, 1904, and chapter
68 was approved April 29, 1904. Chapter 68 now appears as
section 1989-a1 and following sections, with two or three
exceptions, which will be referred to. Section 1989-a49, Code
Supp., providing for pumping stations, is section 5, chapter
94, Acts of 32d G. A., and was passed in 1907. This section
was in force until amended by chapter 87, Acts of 34th Gen-
eral Assembly, and did not require any particular number of
signatures to the petition. The only provision as to such sig-
natures was that contained in section 1989-a2, which reads,
"whenever a petition signed by one or more of the landown-
ers whose lands will be affected," etc., "the board shall ap-
point an engineer," etc., unless chapter 69, Acts of 30th G.
A., requiring 50 per cent., applied. This was the situation at
the time appellants filed their petition.

Prior to the passage of the drainage act by the Thirtieth
General Assembly (chapter 68), there were already different
systems of drainage laws in the statutes; one being title 10,
chapter 2, of the Code. On April 13, 1904, chapter 69, Acts
of 30th G. A., was passed, and it provides: "The board of
supervisors of any county or counties in the state in which
a drainage district has been or may hereafter be organized in
the manner provided in chapter 2 of title X of the Code may
provide for the establishment and maintenance of a pumping
station," etc. This is the act requiring the signatures of 50

per cent. of the landowners of such district. This amendment became a part of the drainage laws, that is, a part of chapter 2, title 10, of the Code, prior to the time when chapter 68 was passed. When chapter 68 was passed, by section 48 therein it was provided: ''Additional to Statutes. The provisions of this act shall be construed as additional to chapter two, title X of the Code and Supplement, relating to the location, establishment and construction of levees, drains, ditches and water courses and shall not be held to repeal any of such provisions.''

In 1906, by chapter 84, Acts of 31st General Assembly, chapter 68 of the Thirtieth General Assembly was amended, and section 6 added, which provides that section 48 of the act is amended by inserting immediately following the word ''as'' and before the word ''additional'' in the second line of said section the words ''and independent procedure.'' (Evidently ''and'' should be ''an.'') If chapter 68 was not an independent procedure, it became so by the act of the Thirty-First General Assembly, and was such when appellants filed their petition in 1910, and whatever amendment had been made by chapter 69 of the Thirtieth General Assembly has nothing to do with chapter 68; chapter 69 being an amendment to chapter 2, title 10, of the Code.

Afterwards, and in 1907, the Thirty-Second General Assembly provided for pumping stations. This amendment has been heretofore referred to, and is as follows: ''The board of supervisors of any county or counties in the state in which a drainage or levee district has been or may hereafter be organized as provided in this act may provide as a part of said drainage system for the establishment and maintenance of a pumping station or stations, when and where the same may be necessary to secure a proper outlet for the drainage of the land comprising the said district and the cost of construction and maintenance of said pumping station or stations shall be levied upon and collected from the lands in the drainage or levee district in the same manner as provided for

in the construction and maintenance of ditches or drains or levees in this act.''

As we have already shown, when the petition was filed in this case the only requirement, so far as the number of petitioners is concerned, was as the law then appeared in section 1989-a2, that is, ''one or more.'' April 20, 1911, after these proceedings had been commenced, the Thirty-Fourth General Assembly by chapter 87 amended section 1989-a49, providing that not less than one-third of the owners should sign a petition; but a saving clause was added. Section 8 of said act is as follows: ''Nothing contained in this act shall be held to affect pending litigation or any proceedings heretofore had under the laws hereby amended.'' This amended the act under which appellants had initiated their action to establish this drainage district and pumping station. The important thing in these proceedings, so far as the point now being considered is concerned, was the filing of the petition. At the time it was filed it was sufficient as to the number of signatures. The proceedings had been pending more than a year, and were during that time being contested and litigated by appellees. In our opinion, the rights of the board of supervisors and petitioners were saved by this clause, and that their rights in regard to the pumping station are the same as though the act of the Thirty-Fourth General Assembly had not been passed. In March, 1910, when plaintiffs filed their petition for the district and pumping station, one method of commencing proceedings would have been under chapter 2, title 10, of the Code, and in that case certain things were required, or proceedings could have been commenced under section 1989-a1, and following sections, as amended by the law of 1907, heretofore referred to. Under the last method one or more owners could petition for a district, which would include a pumping station, as a part of the drainage system, without regard to chapter 69, Acts of 30th G. A.

It has been recently held that proceedings may be initiated under any of the different methods. *Lyon v. Board*, 155

Iowa, 367. The reasons for amending chapter 2, title 10, of the Code by chapter 69, Acts of 30th General Assembly, requiring the signatures of 50 per cent. of landowners to the petition, and for amending chapter 68, Acts of 30th General Assembly (section 1989-a2), by chapter 87, Acts of 34th General Assembly, which now requires the signatures of one-third of the owners, have not been argued, and perhaps we should spend no time on that. One reason occurs to us—parties proceeding under section 1940 of chapter 2, title 10, of the Code were required to secure a petition signed by a majority of persons residing in the county owning land abutting upon such improvement; but to establish a pumping station the amendment provides that a petition signed by 50 per cent. of the landowners of the district must be secured, whether they be residents of the county or not. But if proceedings were commenced under sections 1989-a2 and 1989-a49, a petition signed by one or more was sufficient for a drainage district and pumping station until the passage of chapter 87 of the Thirty-Fourth General Assembly, which required the signatures of one-third of the owners of lands benefited thereby for the establishment and maintenance of a pumping station. There may be other reasons. As we have said, the two methods are separate and independent, and proceedings may be instituted either way.

In this case the pumping station is a necessity. To establish a pumping station without authority to maintain it would be a useless proceeding. The statute provides that drainage laws shall be liberally construed to promote drainage. It is contended by appellees that the saving clause referred to does not cover this case, because, as they say, there was no litigation to save, and because the words "any proceedings heretofore had" mean any completed act or order which the board had made. This construction would be too narrow. Litigation is a judicial controversy. Appellees were contesting the matter before the joint boards, a tribunal whose functions in this matter were in part judicial. We see no reason to single

out the one act of the board in making the order establishing the district as a proceeding, and to say that other acts were not a part of the proceedings. Each act done after the filing of the petition, and before the law was changed, was a part of the proceedings.

It was objected by appellees that the new district No. 13 included only a part of old district No. 3, and omitted such of No. 3 as is north of the southern city limits of Muscatine; that the lands so omitted were benefited and should have been included. The argument is somewhat inconsistent, it seems to us, because it is first argued that the lands south of the city limits which were included in No. 13, and which were in old No. 3, and adjacent to those in the city limits, were not benefited at all because they already had drainage, and that they should not be included in the new district, and then the argument proceeds on the theory that the lands in No. 3 and in the city which were not included in No. 13 were benefited and should have been included. These lands and lots in the city were similar in character and drained in the same way as those without, that is, into Muscatine slough, and will continue to be so drained unless later included in the city sewer and drainage system. It is not claimed by appellees, as we understand them, that one district may not be included in another. The statute provides that this may be done, and it has been so decided. *Kelley v. District,* 158 Iowa, 735. See also, *Drainage District v. Hardin County,* 146 Iowa, 564, 577. Appellees cite on this point *Zinser v. Board,* 137 Iowa, 660, 670. In that case the engineer included all lands within the watershed, without reporting how the different tracts would be affected. Some of the lands so included were lands already well drained, and which would not derive any benefit, and the court said there could have been but one purpose in including such land, and that was to compel those owning well-drained lands within the watershed to contribute to reclaiming the wet and overflowed slough lands of the petition-

5. SAME: extent of district: lands in another district: assessment of benefits.

ers. As we have said, appellees claim that the lands south of the city limits in No. 3 should not have been included because not benefited, and that those north and adjacent should have been included because they were low, wet, and would be benefited. There is evidence that some of the lands and lots in the city would be benefited. If it be true that the lands in the city were benefited, it would not be a ground for setting aside the order establishing the district. They can be included later, if they are found to be substantially benefited, and it is thought advisable.

Nor would that be a reason for excluding the lands in No. 3 south of the city limits, if such lands were benefited. They can only be assessed according to the benefits to them, and when the assessment is made the commissioners must take into consideration the value of the old improvement, and allow a credit to the parties owning the old improvement as their interests may appear. Code Supp. Section 1989-a25; *Kelley v. District,* 158 Iowa, 735.

The engineer and the joint board found that these lands south of the city limits would be benefited, and we are of the same opinion. Appellees do not claim even in argument that

6. SAME: extent of district: discretion of board.

old No. 3 was adequate, but say it gave fairly adequate drainage to the lowlands. One sentence in the testimony of the engineer has been singled out, and we think given undue weight by counsel and by the trial court. He did say on cross-examination that one reason for omitting from district No. 13 the lands and lots in district 3 in the city limits was that they wanted to avoid the opposition that would arise from South Muscatine, but he explains this by saying that part of this territory consisted of city properties, and that the agricultural lands in the city may become city lots; that because of this the sanitary requirements of the city drainage are under the control of the city, and that he should not undertake to give any other benefit; that the benefits to those in the city would not be sufficient to warrant the interference with city drainage and the

opposition that would arise from that source; that their benefits are so small that it is a question whether they would be worth much, if anything. He also testified that he left out the lands in Muscatine for the interests of the district; that he had to stop somewhere, where the benefits were tangible and could be measured, so he stopped at the city limits. This, of course, is true, unless the entire watershed is to be included in the district. After all, this was a matter for the board, aided by or based upon the report of the engineer, and was within the legislative discretion of the board.

For the reasons given, it is our opinion that the trial court erred in annulling the action of the board. The cause is reversed, and a decree will be entered in the district court, or in this court, at the election of appellants, confirming the action of the joint board in establishing the district, and the pumping station, and its maintenance. *Reversed.*

WEAVER, C. J., and DEEMER, LADD and GAYNOR, JJ., concur. WITHROW, J., takes no part. EVANS, J., absent.