[L. A. No. 5201. In Bank.—December 31, 1917.]

## LOS ANGELES COUNTY FLOOD CONTROL DISTRICT, a Body Corporate and Politic, Petitioner, v. JOHN J. HAMILTON, as Chairman of the Board of Supervisors of Los Angeles, etc., Respondent; OTIS ANDREWS et al., Interveners.

FLOOD CONTROL—LOS ANGELES COUNTY FLOOD CONTROL ACT—CONSTITUTIONAL LAW—DUE PROCESS OF LAW.—The legislature, in enacting the Los Angeles County Flood Control Act, having fixed boundaries of the district for the purpose of assessing upon the lands within the district the cost of the improvement, is presumed to have made proper inquiry, and the constitutional guaranty of "due process of law" does not require that the land owners be accorded a hearing on the question of the inclusion of their lands.

ID.—AD VALOREM ASSESSMENTS.—In such case the legislature in prescribing the mode of distributing the burden by assessing the lands in proportion to their value, without any judicial inquiry into or determination of the extent of the benefits, satisfies all constitutional requirements.

ID.—PUBLIC PURPOSE OF WORK—DETERMINATION OF LEGISLATURE CONCLUSIVE.—The passage of the act by the legislature imports a finding that the proposed work will answer a public purpose.

ID.—LOCAL IMPROVEMENTS—CONSTITUTIONALITY OF ENACTMENT—PRESUMPTIONS.—In inquiring whether an act of the legislature creating a local improvement act transcends legislative power, courts must view the act in the light of every presumption and intendment favorable to its constitutionality, and consider only such facts as appear on the face of the enactment with such others as are matters of judicial cognizance.

Id.—Purposes of Act.—The purposes of the act are broader than the mere protection of lands from direct invasion by flood waters.

Id.—Indirect Benefits—Justification for Assessments.—Accidental or indirect benefits are sufficient to justify the imposition of a part of the burden of an improvement.

Id.—Boundaries of District—Determination of.—The limits of a district specially benefited by a proposed improvement may coincide with those of an existing political division, and the fact that the boundaries of a flood control district coincide with those of a county does not justify the conclusion that the legislature fixed the boundaries upon an arbitrary and accidental basis and not upon a consideration of the benefits to be derived from the work.

Id.—Omitting Work Within a Municipality—Validity of Such Provision.—A provision in a local improvement act which authorizes the board having control of the improvement to omit the doing of work within a municipality, included in the boundaries of the district which withholds its approval, does not invalidate the act.

Id.—Assessment of Cost—Effect of Designating Assessment as a Tax.—The Los Angeles County Flood Control Act is not invalidated by the fact that the word "tax" is used throughout the act to designate the means by which funds are to be raised to pay for the work, since it is apparent that the word "tax" is used to designate a special assessment.

Id.—Exemption of Lands from Assessment.—In the absence of constitutional legislation, the legislature has power to exempt property from taxation, including special assessments as well as general taxes.

Id.—Defective Organization of District — Legislative Ratification.—All defects, if any, in the organization of the Los Angeles County Flood Control District, and in the proceedings up to and including the issuance of bonds, were cured by the ratifying and confirmatory act of May 15, 1917 (Stats. 1917, p. 239).

Id.—Election—Issuance of Bonds.—Since an election is not required by any constitutional provision, and is not made jurisdictional by the terms of the Flood Control Act, the legislature might have provided for the issuance of bonds without giving any voice to the people of the district.

APPLICATION for Writ of Mandate to the chairman of the Board of Supervisors of Los Angeles County as *ex-officio* chairman of the Board of Supervisors of Los Angeles County Flood Control District.

The facts are stated in the opinion of the court.

A. J. Hill, County Counsel, Roy V. Reppy, Assistant County Counsel, O'Melveney, Milliken & Tuller, Sayre Macneil, and Hewlings Mumper, for Petitioner.

Wm. M. Hiatt, for Respondent.

Fred Baker, and Joseph H. Hall, *Amici Curiae*.

Charles La Verne Larzalere, and Edward Winterer, for Interveners.

SLOSS, J.—Los Angeles County Flood Control District was created by an act of the legislature, approved June 12, 1915 (Stats. 1915, p. 1502), and known as the "Los Angeles County Flood Control Act." Steps were taken looking to the issuance of bonds under this act, and the present proceeding is one in mandate to compel the chairman of the board of supervisors of Los Angeles County, as chairman of the board of supervisors of said district, to sign one of such bonds. An alternative writ was issued. The return of the respondent was made by demurrer to the petition. Andrews and others intervened, and filed an answer in opposition to the granting of the relief sought by the petition. The facts are undisputed, the proceeding being submitted upon questions of law alone. The grounds of opposition to the granting of the relief sought may fairly be grouped under two heads. It is contended, in the first place, that the act creating the district is unconstitutional and void, and second, if the validity of the legislation be upheld, that the steps prescribed as prerequisites to the issuance of bonds were not regularly taken.

The act creates a flood control district to be called "Los Angeles County Flood Control District," comprising all of the county of Los Angeles lying south of the north line of township 5 north, San Bernardino base, except the islands off the coast included in Los Angeles County. The objects and purposes of the act, as stated in section 2, are "to provide for the control of the flood and storm waters of said district, and to conserve such waters for beneficial and useful purposes by spreading, storing, retaining or causing to percolate into the soil within said district, or to save or conserve in any manner, all or any of such waters, and to protect from dam-

age from such flood or storm waters the harbors, waterways, public highways and property in said district." The district is declared a body corporate and politic, and is given a number of powers usually conferred upon public corporations. One of the powers so granted is "to cause taxes to be levied and collected for the purpose of paying any obligation of the district in the manner hereinafter provided." By section 3 the board of supervisors of Los Angeles County is designated as *ex officio* the board of supervisors of the district. The various county officers are made *ex-officio* officers of the flood control district, and are directed to perform without additional compensation the same duties for said district as for the county of Los Angeles. The board of supervisors is given jurisdiction and power, and it is made their duty to employ by resolution, "a competent engineer or engineers to investigate carefully the best plan to" carry out the purposes declared in section 2. It is provided that such resolution shall direct such engineer or engineers to make and file a report with the board of supervisors, which shall show a general description of the work to be done, with plans and specifications, a description of the property to be taken or injured, a map showing the proposed work, and an estimate of the cost of such work, of the property to be taken or injured, and of all incidental expenses, stating also the total amount of bonds necessary to be issued to pay for the same. After the filing of this report, the board shall consider the same, adopt it as made or as modified to its satisfaction, stating the amount of the entire estimated cost for which bonds are to be voted. The finding in said resolution as to the sufficiency of the report, and that the same complies with all of the requirements of the act, shall be final and conclusive against all persons except the state.

After the adoption of the report, the board is required to call without delay a special election, and submit to the qualified electors of the district the proposition of incurring a bonded debt in the amount and for the purposes stated in the report. The manner of calling the election is prescribed in detail by the act. If a majority of the votes cast are in favor of incurring such bonded indebtedness, bonds of the district "shall be issued and sold as in this act provided." The bonds are to be signed by the chairman of the board of supervisors, and countersigned by the auditor of Los Angeles

County.   The act provides for the sale of the bonds at not less than par.   Any bonds so issued are declared to be "a lien upon the property of the district," and it is provided that such bonds and the interest thereon shall be paid "by revenue derived from an annual tax upon the real property within said district, and all the real property in the district shall be and remain liable to be taxed for such payments as hereinafter provided."   By section 10, the board of supervisors is required to levy a tax each year upon the taxable real property in the district sufficient to pay the interest on said bonds for that year, and such portion of the principal as is to become due before the time for making the next general tax levy, the taxes to be levied and collected at the time and in the same manner as the general taxes levied for county purposes.   The board of supervisors is given power, in any year, to levy in like manner a tax upon the taxable real property of the district to carry out any of the objects of the act, such taxes not to exceed ten cents on each one hundred dollars of the assessed valuation of the real property of the district, exclusive of taxes levied to meet principal and interest of bonds.   The act then goes on to provide for the doing of work under the act, and declares that the plans and specifications for any work to be done in any municipality must first be approved by the legislative body of such municipality before the commencement of such work, or the letting of any contract therefor.   In case such approval is withheld for thirty days, the board of supervisors shall omit the doing of such work within such municipality, "and such omission shall not affect the validity of its proceedings," and the funds which were to be expended in the municipality may be expended elsewhere by the board of supervisors.

There are further provisions which it is not necessary, for present purposes, to set forth.

Of the various objections to the validity of this act, the one urged with the greatest vigor is that the statute violates the provisions of the federal and the state constitutions prohibiting the taking of property without due process of law.   Reduced to its final terms, this claim is founded on the assertion that the boundaries of the district include considerable property which will not and cannot receive any benefit from the contemplated improvement.   The scheme of the act is one of local improvement.   The warrant and justification for char-

ging the cost of such improvement upon designated lands is to be found, in theory at least, in the benefit to be derived by the lands assessed from the contemplated work. (*Reclamation Dist.* v. *Birks,* 159 Cal. 233, 241 [113 Pac. 170].) Where, as in the act before us, the boundaries of the district are determined by the legislature itself, the constitutional guarantee of due process does not require that the land owners shall be accorded a hearing on the question of the inclusion of their land within the district. ''The legislature has power to fix such a district for itself without any hearing as to benefits, for the purpose of assessing upon the lands within the district the cost of a local, public improvement. The legislature, when it fixes the district itself, is supposed to have made proper inquiry, and to have finally and conclusively determined the fact of benefits to the land included in the district, and the citizen has no constitutional right to any other or further hearing upon that question.'' (*Fallbrook Irr. Dist.* v. *Bradley,* 164 U. S. 112, 174, [41 L. Ed. 369, 17 Sup. Ct. Rep. 56]; *Reclamation Dist.* v. *Phillips,* 108 Cal. 306, 314, [39 Pac. 630, 41 Pac. 335]; *People* v. *Sacramento Drainage Dist.,* 155 Cal. 373, 386, [103 Pac. 207]; *Brookes* v. *City of Oakland,* 160 Cal. 423, [117 Pac. 433].)

In addition to defining the limits of the district, the legislature by the act itself prescribed the mode of distributing the burden, by assessing the lands in proportion to their value. It is thoroughly settled that the legislature may apply the *ad valorem* method of assessment, without any judicial inquiry into, or determination of, the extent of benefits. Recognizing that absolute equality cannot be attained under any system of taxation or assessment, the courts hold that constitutional requirements are satisfied by that approximation to equality which may fairly be thought to result from an assessment of the cost upon the property benefited in proportion to its ascertained value. (*Burnett* v. *Mayor etc. of Sacramento,* 12 Cal. 76, 84, [73 Am. Dec. 518]; *In re Madera Irr. Dist.,* 92 Cal. 296, [27 Am. St. Rep. 106, 14 L. R. A. 755, 28 Pac. 272, 675]; *Thomas* v. *Pridham,* 171 Cal. 98, 104, [153 Pac. 933]; *Fallbrook Irr. Dist.* v. *Bradley, supra.*)

The mere passage of the act, then, must be taken to import a finding by the legislature that the proposed work will answer a public purpose, and that its execution will benefit the land within the district to such an extent as to warrant the

imposition upon such land of the cost in the manner provided. The findings thus implied are as fully effective as if declared in express terms in the act itself.   (*San Christina Inv. Co.* v. *San Francisco,* 167 Cal. 762, 769, [52 L. R. A. (N. S.) 676, 141 Pac. 384].)   The fixing of the district which is to bear the expense of a local improvement, and the mode in which such expense is to be borne and distributed, are primarily legislative questions. (*Hadley* v. *Dague,* 130 Cal. 207, 220, [62 Pac. 500] ; *Glide* v. *Superior Court,* 147 Cal. 21, 25, [81 Pac. 225].) Ordinarily the courts will feel themselves bound by the legislative body's determination of these questions.   Indeed, there are not a few decisions containing expressions to the effect that the legislative determination that certain land will be benefited, and that the cost of the work should be assessed upon it according to a given plan, is conclusive.   But since the imposition of such costs finds its ground of sanction in the benefits conferred upon the lands charged, it may well be that the legislative conclusion should not be upheld where the court can see that it is contrary to any rational view of the facts, and that lands have been included that "plainly could not by any fair or proper view of the facts be benefited."   (*Fallbrook Irr. Dist.* v. *Bradley, supra; Myles Salt Co.* v. *Board of Commrs. of Iberia etc. Drainage Dist.,* 239 U. S. 478, [60 L. Ed. 392, 36 Sup. Ct. Rep. 204].)   It must, however, be remembered that, in inquiring whether a given act of the legislature creating a local improvement district does thus transcend the limits of legislative power, we are governed by the rules applicable to any judicial examination of the validity of a statute.   Not only must the court view the act in the light of every presumption and intendment favorable to its constitutionality, but it must limit itself to a consideration of such facts as appear upon the face of the enactment, together with such others as are matters of judicial cognizance. Neither allegation nor proof of further facts can be considered. (*Stevenson* v. *Colgan,* 91 Cal. 649, [25 Am. St. Rep. 230, 14 L. R. A. 459, 27 Pac. 1089] ; *People* v. *Sacramento Drainage Dist.,* 155 Cal. 373, [103 Pac. 207] ; *San Christina Inv. Co.* v. *San Francisco,* 167 Cal. 762, [52 L. R. A. (N. S.) 676, 141 Pac. 384].)

We need not enter into a discussion of the extent to which the court may take judicial notice of the topography of the territory covered by the act.   The substance of  the claims

made by the respondent and the interveners is that the district contains several separate and unconnected watersheds, that it comprises a considerable area of mountainous land, much of which lies above the plane of any flood waters that are to be anticipated, and that a good deal of other land is beyond the area of possible floods. Much of the argument against the validity of the act seems to proceed on the assumption that the one object sought by the creation of the district is the protection of lands from direct invasion by flood waters. A reference to section 2 of the act, which we have, in part, quoted, will show that the purposes are much broader. In addition to the purpose just stated, the act was designed to conserve the flood waters for beneficial and useful purposes by storing them, or otherwise, and to protect from damage by flood the harbors, waterways, and public highways in the district. To say, therefore, that any given parcel or tract of land is not directly subject to overflow is not to say that it cannot be benefited by the carrying out of the proposed plan. E'ven if the scope of the act were much narrower than it is, we should, under the decisions, be required to hold that the benefit which would justify the inclusion of land within the district need not be so direct and immediate as is assumed in the argument of counsel opposing the validity of the act. Thus, an incorporated city may be embraced within the boundaries of an irrigation district, although much of the land in the city does not require, and could not use, irrigation. (*Board of Directors* v. *Tregea,* 88 Cal. 334, [26 Pac. 237]; *In re Madera Irr. Dist.,* 92 Cal. 296, 343, [27 Am. St. Rep. 106, 14 L. R. A. 755, 28 Pac. 272, 675]; *Fallbrook Irr. Dist.* v. *Bradley, supra.*) Similarly, in other jurisdictions, it has been held that the inclusion in a drainage district of high lands not subject to inundation does not conclusively show a lack of benefit to such lands. (*In re Mingo Drainage Dist.,* 267 Mo. 268, [183 S. W. 611]; *Mittman* v. *Farmer,* 162 Iowa, 364, [Ann. Cas. 1915C, 1, 142 N. W. 991]; *Butler.* v. *Fourche Drainage Dist.,* 99 Ark. 100, [137 S. W. 251]; *Memphis L. & T. Co.* v. *Levee Dist.,* 64 Ark. 258, [42 S. W. 763]; *Miami County* v. *City of Dayton,* 92 Ohio St. 215, [110 N. E. 726].) An examination of these cases will show that the courts have regarded an incidental or indirect benefit as sufficient to justify the imposition of a part of the burden of the improvement. Such indirect benefit may result from the im-

provement of neighboring and surrounding land, and the consequent increase in the value of all land within the district. But, as above indicated, we see in this act other purposes than that of the mere protection of lands privately owned from overflow. So far as the court can know, the flood waters to be stored and conserved may be beneficially applied to lands not themselves subject to inundation. The proper maintenance of the harbors by protecting them from flood damage, the preservation of the means of communication between the different parts of the district by guarding against damage to highways and bridges—these are purposes whose execution may well be of substantial and immediate benefit to all of the lands included within the district. At least, it is impossible, in the light of the facts of which we may take judicial knowledge, to say that the legislature could not fairly so determine. The mere fact that several watersheds are included within the boundaries of the district does not necessarily require a conclusion that the scheme of protection could not properly be taken up as a unit. In *People* v. *Sacramento Drainage Dist.*, 155 Cal. 373, [103 Pac. 207], the court dealt at some length with the considerations which might properly lead the legislature to substitute for the ineffective action of numerous small improvement districts a general plan covering a large area whose safety and development are threatened by a common danger. Similar considerations apply here. Certainly, this court cannot say that the protection of this district from the various evils incident to floods could not best be accomplished by a single comprehensive plan. Apart from any other consideration, the protection of the roads in any one of the watersheds, and the maintenance of communication with the others, might be a matter of very direct concern to all of the land embraced within the district. Whether the work could best be done as a whole, or should be committed to the direction of separate districts, is, in reality, a question of engineering rather than one of constitutional law. It is, therefore, a question for legislative determination.

Much is made of the fact that, except on its northern line, the boundaries of the district are those of the county of Los Angeles. From this it is argued that the action of the legislature in fixing the boundaries was founded upon an arbitrary and accidental basis rather than upon a consideration of the benefits to be derived from the work. But the conclusion does

not follow. There is nothing in the nature of things making it inconceivable that the limits of a district specially benefited by a proposed improvement should, in whole or in part, coincide with those of an existing political subdivision.

Before leaving this branch of the discussion, it may be well to say a word about the provision authorizing the board to omit the doing of work within a municipality withholding its approval thereof, and to make expenditure elsewhere. The purpose obviously is to give to the municipalities within the district a certain measure of control over the doing of work within their boundaries. We do not see how the provision affects the validity of the act. The right to impose an assessment upon land within an improvement district is, of course, not dependent upon the doing of work upon or near the land in question. The act contemplates that the board shall expend the money in such manner as to carry into effect a plan which shall benefit the district as a whole. If the plan originally adopted contemplates work within a municipality, and, on account of the objection of the municipal authorities, this particular work cannot be done, it must be presumed that the board, in applying the money elsewhere, will expend it in such manner as to further the general purpose of promoting the advantage of the entire district. In effect, the provision under consideration merely provides for the modification, under certain conditions, of the adopted plan of improvement.

It is next contended that the act is void because it provides for the raising of funds to pay for the work by means of a tax instead of by a special assessment. If such be the case, the act is a palpable violation of the provision of the state constitution, requiring that all property be taxed in proportion to its value. (Article XIII, section 1.) Since the act charges only the real, and not the personal, property in the district, it clearly violates this fundamental mandate, if the burden is a tax, strictly speaking. The interveners point to the fact that the legislature has used the word "tax" throughout the act, and does not anywhere refer to the charge as an assessment. Furthermore, such "tax" is to be levied and collected in the same manner, by the same machinery, and at the same time as general taxes. These facts are not, however, conclusive. The word "tax" is used, with equal propriety, in two distinct senses. In its broad meaning the word includes both general taxes and special assessments. (*Chicago G. W.*

*Ry. Co.* v. *Kansas City N. W. Ry.,* 75 Kan. 167, [12 Ann. Cas. 588, 88 Pac. 1085] ; 1 Page and Jones on Taxation by Assessment, sec. 40. See, also, *In re Madera Irr. Dist.,* 92 Cal. 296, [27 Am. St. Rep. 106, 14 L. R. A. 755, 28 Pac. 272, 675].) Taking, as, under the settled rule of constitutional law, we must, that construction which will uphold the act, we conclude that the legislature must have intended to use the meaning which would admit of the charge being construed as a special assessment. "The very fact that personal property is excluded from bearing the cost of the improvement and that the word 'property' is held to mean by the terms of the act to be real property, forces us to the conclusion that it was the intention of the legislature to provide for the cost of the improvement by way of assessment, as in other drainage cases." (*Miami County* v. *Dayton,* 92 Ohio St. 215, [110 N. E. 726].) In *Doyle* v. *Austin,* 47 Cal. 353, an act (Stats. 1871–72, p. 911), providing for the opening of Montgomery Avenue, in the city of San Francisco, was assailed upon the ground, among others, that it imposed a "tax" in a special improvement district without following the provisions of the constitution with reference to the assessment and levy of taxes. The court answered the contention in these words: "It sufficiently appears on the face of the act that the whole scheme contemplates an assessment and not a tax. The two are essentially different in their nature, and designating as a tax that which in its elements is an assessment can have no effect in determining whether it is one or the other. The question must be decided by the nature of the imposition, and not by the mere name by which it is called." There are many other instances where the word "tax" has been used to designate a special assessment. (*Wagner* v. *Baltimore City,* 239 U. S. 207, [60 L. Ed. 230, 36 Sup. Ct. Rep. 66] ; *Yeatman* v. *Crandall,* 11 La Ann. 220; *Daily* v. *Swope,* 47 Miss. 367.) It is true that local improvements may be provided for by means of a tax, instead of an assessment upon the lands benefited. (*People* v. *Whyler,* 41 Cal. 351; *Southern Pac. Co.* v. *Levee Dist.,* 172 Cal. 345, [156 Pac. 502].) But, in the cases just cited, and others like them, where the charge has been held to be a tax, it has been a burden imposed on personal as well as real property.

It is argued, in this connection, that, if the act provides for an assessment, it is open to the objection that it exempts some

of the lands which will receive benefits. The argument is that only land subject to general taxation is to be assessed, and that the exemptions from such taxation will relieve certain lands which should be charged. On the other hand, the petitioner contends that the act, properly construed, does not contemplate the exemption of any benefited property (except, perhaps, that devoted to a public use). The proper time to decide this question of interpretation will arrive when the question arises in a case involving the right to assess particular property. There is no occasion to decide it now. It is thoroughly settled that, in the absence of constitutional restriction, the legislative power to exempt property from taxation extends to every form of the taxing power, including special assessments, as well as general taxes. (28 Cyc. 1131; 12 Am. & Eng. Ency. of Law, 2d ed., 314; Cooley on Taxation, 3d ed., 343; *Dyker Meadow Land etc. Co.* v. *Cook,* 3 App. Div. 164, [38 N. Y. Supp. 222]; *Milwaukee El. etc. Co.* v. *Milwaukee,* 95 Wis. 42, [69 N. W. 796]. See, also, *Doyle* v. *Austin,* 47 Cal. 353.) As was said in the Wisconsin case just cited: "Assessments are special taxes, and the power to exempt particular classes or kinds of property from assessments stands on as clear and undoubted ground as the power to make exemptions, in such cases, from general taxation."

The act is also attacked on the ground that it violates subdivision 28 of section 25 of article IV of the constitution of California, in that it creates offices by special legislation, and also imposes duties on county officers by special act. In answer to this objection, it is unnecessary to do more than cite the cases of *People* v. *Sacramento Drainage Dist.,* 155 Cal. 373, [103 Pac. 207], and *Matter of Bonds of San Joaquin Irr. Dist.,* 161 Cal. 345, [119 Pac. 198], where similar statutory provisions were under consideration.

Other constitutional objections to the act are urged. Without specifying them, we think it sufficient to say that they are met by the foregoing discussion and citations of authority.

The attack on the proceedings designed to authorize the issuance of the bonds is put, in the main, on two grounds. It is claimed, first, that the report of the engineers was not sufficiently specific to give the board jurisdiction to proceed, and, second, that the necessary steps preliminary to the holding of an election were not taken. If the proceedings were de-

fective in either or both of these respects, the force of the objections has been removed by an act of the legislature, approved May 15, 1917.   (Stats. 1917, p. 239.)   This act, which became effective July 27, 1917, provides that the bonds in question "and all the acts and proceedings of said district, leading up to and including the authorizing and issuance of said bonds, are hereby legalized, ratified, confirmed and declared valid to all intents and purposes," and that the finding of the board of supervisors in favor of the validity of the bond election should be final and conclusive against all persons except the state of California, which could question the proceedings by suit by the attorney-general within thirty days after the act became effective.   This curative act wiped away whatever mistakes there may have been in the procedure attacked by the interveners.   It is said by the interveners that the holding of the election is, by the terms of the Flood Control Act, made jurisdictional.   But it is not a step required by any constitutional provision.   No election need have been authorized in the first instance.   The legislature might have provided for the issuance of the bonds without giving any voice in the matter to the residents of the district.   (*In re Bonds of San Joaquin Irr. Dist.*, 161 Cal. 345, [119 Pac. 198] ; *State* v. *Monahan,* 72 Kan. 492, [115 Am. St. Rep. 224, 7 Ann. Cas. 661, 84 Pac. 130].)   This being so, the legislature could, by the subsequent act, do away with the necessity of such procedural steps, or with the effect of failure to take them properly.   (*Chase* v. *Trout*, 146 Cal. 350, [80 Pac. 81] ; *Sacramento* v. *Adams,* 171 Cal. 464, [153 Pac. 908] ; *Imperial Land Co.* v. *Imperial Irr. Dist.*, 173 Cal. 660, [161 Pac. 113].)

Other points are raised which, in view of what has already been said, we do not deem it necessary to mention.

It is ordered that a peremptory writ of mandate issue as prayed.

Melvin, J., Henshaw, J., and Lawlor, J., concurred.