C. J. HALL, Appellee, v. C. H. POLK et al., Appellants.

**DRAINS:** Establishment—Appeal—Review of Fact Findings.
1 Courts will overrule the board of supervisors in its findings on

questions of *fact* involved in orders establishing drainage improvements only when the objectors establish a fairly clear case of error. Evidence reviewed, and held insufficient to overthrow the findings of the board: (a) That the expense would not exceed the benefits; (b) that the area of the district was sufficient to justify the expenditure; and (c) that all benefited lands were included.

DRAINS: Establishment—Appeal—Reviewable Matters. Findings
2 of *fact* involved in the establishment of public drainage improvements are appealable: i. e., whether the proposed improvement is adequate, or whether the costs will be out of all reasonable proportion to the benefits.

DRAINS: Establishment—Benefits—Direct and Immediate Benefits.
3 In determining the question of benefits, preliminary to the establishment of a drainage improvement, the test is not whether market values will be *immediately* affected, but whether, within a *reasonable time,* the proposed improvement will adequately increase the actual values of the lands within the proposed district.

DRAINS: Establishment—Preliminary Survey—Sufficiency. The
4 preliminary survey of a drainage project, having for its object the straightening of a natural watercourse, is not insufficient because it does not specify in detail the manner in which the waters of lateral streams will be taken care of. Such details properly belong in the permanent survey.

WITNESSES: Competency—Drainage—Adequacy of Proposed Plan.
5 A nonexpert witness on scientific drainage, even though residing in the immediate locality, and having knowledge of local conditions, is not competent to express an opinion as to the *adequacy* of a proposed drainage scheme—that is, whether it would so carry off the waters cast upon it by ordinary rains, seepage, lateral streams, lateral drainage, and tiling, as to avoid overflow.

WITNESSES: Competency—Drainage—Physical Conditions, Past
6 and Present. Nonexperts on drainage matters are competent to detail the present physical *fact* conditions surrounding a proposed public drainage improvement, and the past *fact* conditions, as observed by them, as bearing on the adequacy of the proposed improvement and on the preliminary issue of benefits or injury to the lands within the proposed district.

DRAINS:    Establishment—Appeal—Inadequate    and    Speculative
7  Scheme.  An order establishing a public drainage improvement
    will be set aside when it fairly appears that the scheme is
    inadequate, and would be, experimental, with the probabili-
    ties strongly in favor of inefficiency.  So held where the ditch
    proposed was purposely made smaller than necessary, in order to
    save costs, it being contemplated that nature would in time
    enlarge it to a size sufficient to properly care for all waters;
    but whether it would so enlarge within a reasonable time was
    left in doubt and speculation, with probability strongly in favor
    of inefficiency.

*Appeal from Fremont District Court.*—O. D. WHEELER,
                              Judge.

                    NOVEMBER 21, 1917.

APPEAL from a decree setting aside the findings and·
order of the board of supervisors of Fremont County, es-
tablishing a drainage district.—*Modified and affirmed.*

*T. S. Stevens* and *William Eaton,* for appellants.

*Tinley, Mitchell & Thornell,* for appellee.

LADD, J.—On July 8, 1913, certain own-
1. DRAINS: es-       ers of land which would be affected thereby
tablishment:
appeal: re-          petitioned the board of supervisors of Fre-
view of fact
findings.           mont County to establish a drainage dis-
                    trict and order the excavation of a ditch to
drain the same, extending from the county line on or near
the Northeast Quarter of Section 13, Township 69 North,
Range 40 West of the 5th P. M., southwesterly, in the gen-
eral course, as nearly as practicable, of the East Nishna-
botna River, to the northeasterly end of the Rankin-Cow-
den ditch, or extension thereof, in Section 21, Township 71
North, Range 41 West.  Seth Dean was designated as en-
gineer, to survey and report on the feasibility of the enter-
prise and such other matters as the statute requires, and he
so did, January 26, 1914, accompanying such report with

a map or plat. Therein he described the river as rising in Carroll County, about 100 miles northeast of where it flows through the eastern line of Fremont County; that its course is so sinuous as to be 200 miles long in that distance; that its average fall in a direct line is 4.7 feet per mile, and is considerably more toward the source than near the outlet; that it drains 1,070 square miles, the watershed being from 6 to 30 miles wide; that it has many tributaries from 2 to 40 miles in length, which bring the water into it in times of heavy rainfall, "in quantity forming a flood wave, in the valley near Atlantic, that overtops the banks and submerges the adjoining bottom lands and flows down the valley at the rate of about one-fourth mile per hour. The width of land submerged in Fremont County by these floods varies from one eighth of a mile to one and a half miles, and the depth of water runs from nothing to five feet. The duration of the flood wave in Fremont County is from a few hours to several days, and the damage caused to the landowner depends largely on the season of the year that the flood occurs; for, should one appear in the early spring from rain or melting snow, but little real damage may be done, but should one appear during the crop period, it usually results in a loss of the use of the lands submerged, for the season."

The report recommends that a ditch 11.59 miles long be excavated to carry off the water, instead of the river, whose course is 20.50 miles, thereby shortening the distance 46 per cent.: the ditch to be 12 feet deep, 20 feet wide at the bottom, 44 feet at the top, and to have a fall of 2.51 feet per mile, instead of the fall of the river, which is 1.46 feet per mile. The ditch was to follow generally the direction of the river, and considerable of it was to be located in the bed of that stream; and it is said that the relocation of but one bridge will be necessary, and that it

permits of the development of drainage systems on either side, whenever the landowner shall conclude to establish same. He estimated the earth to be excavated at 870,000 cubic yards, and says of the channel that it—

"is an economical one to cut with a floating dredge, the only machine now on the market with which I am acquainted that can successfully do this work, and experience has proven that, by adopting a size of channel suited to machines built in standard sizes for such work, much better bids can be secured for construction than by designing a strictly theoretical size of ditch, requiring specially designed machinery to do the work. I do not claim nor expect that the channel above recommended will carry all the water that comes down the valley in time of heavy flood flow: such a channel would require much greater capacity; but the one above recommended will care for probably nine tenths of the flood flows, and nature will enlarge the channel in proportion to the volume of water flowing therein from year to year until it will be ample for all needs, it being more economical in this case to let the river do part of the work than to pay a contractor. I estimate the cost of reclamation as follows, viz.:

"Estimated cost.

"For right of way, 210 acres @ $75 ..............$15,750
"Excavating 870,000 cubic yards @ 7½c .......... 61,363
"Inlets and local drainage ...................... 3,000
"Administration, engineering expenses, legal fees,
    court costs and incidentals ................. 8,000

"Total .....................................$88,113

"The total area of land within the proposed drainage district is about 9,205 acres. From this is to be deducted the right of way for the ditch, and the area in county roads, leaving the net taxable area about 8,954 acres, to which can

be added 4 miles of railroad track and 10 miles of county road, on which a special tax rate per mile is to be assessed, making the flat rate tax per acre about $9.72, with a maximum rate about $14.58, and a minimum rate of about $1 per acre,—sums that can be profitably invested in the enterprise by the landowners, and will bring a sure return in the increased value of the land reclaimed and the increased production of crops."

Then follows the recommendation that the district be established and the ditch excavated. Thereupon, the board of supervisors directed notice to be given, and in due time claims for damages were filed, and appellees and others filed objections to the establishment of the district and improvement as proposed. On hearing, the board of supervisors adopted appropriate resolutions ordering the improvement and defining the boundaries of the district. Fifteen of the objectors appealed therefrom to the district court, where the different appeals were consolidated, and, on hearing, the orders of the board of supervisors were reversed and set aside. The defendants bring the controversy to this court for final adjudication. There were many objections, sixteen in number; but those relied upon went to the adequacy and efficiency of the improvement as proposed, and to whether the burden would not be so out of proportion to the probable benefits as to render the improvement inexpedient. The district court found:

"1. That the benefits to the land described in said drainage district, to wit, East Nishnabotna Drainage District, as reported and recommended by the engineer, Seth Dean, will not justify the expense of the construction of said proposed drainage ditch; and that the expense of the construction of said ditch in said drainage district will be far in excess of any benefits conferred.

"2. That the area of the proposed district is not sufficient to warrant the expenditure proposed.

"3. That not all the lands benefited by the improvement are included within the said drainage district.

"4. That the estimated cost of construction will not cover the expenditure necessary to provide drainage for a large portion of the lands embraced in the proposed district as established by the Board of Supervisors of Fremont County, Iowa, while acting as a drainage commission; nor will the construction of the proposed drainage ditch provide drainage for a large portion of said lands included in the proposed drainage district; nor is provision made for carrying the waters of streams flowing into the district.

"5. That the proposed drainage ditch as ordered by said board, in the drainage district above referred to, is not adequate to carry the usual and ordinary floods, and will not drain said lands in times of usual and ordinary freshets."

2. DRAINS : establishment : appeal : reviewable matters.

It will be noted that these findings, though in detail, merely upheld the objections as stated. The issues are purely of fact, and involve an examination of the record before us and the ascertainment of what deductions should be drawn therefrom. That the court may review the findings of the board of supervisors was settled in *Focht v. Fremont County,* 145 Iowa 130. It is equally well settled that the burden of proof was and is on the objectors to sustain the objections interposed, and that the court will interfere with the action of the board of supervisors reluctantly, and only on a fairly ·clear showing of error in its findings. *Mittman v. Farmer,* 162 Iowa 364; *Temple v. Hamilton County,* 134 Iowa 706; *Prichard v. Board of Supervisors,* 150 Iowa 565.

In determining whether the lands will be benefited, and the extent of such benefits, the test is not whether the market values will be affected immediately thereby, but whether, within a reasonable time, the proposed improvement will increase the actual or intrinsic values or worth of the lands included in the district. *Chicago, R. I. & P. R. Co. v. Wright County Drainage Dist. No. 43,* 175 Iowa 417.

3. DRAINS: establishment: benefits: direct and immediate benefits.

An enterprise such as here contemplated has two main purposes: (1) To facilitate the flow of the waters as they come down from the river above and as these come in from the tributary streams; and (2) to afford an adequate outlet for the drainage of the lands included in the district. Much of this land overflows, more is too wet for cultivation, and scarcely any would not be greatly benefited by adequate tile drainage. Some of the excess of water comes from the hills north and west of the proposed ditch as the rain falls, and it may be that a portion of the injury to land from this source might not be obviated by taking away the water below. Undoubtedly, soil or debris would continue to be washed from the hill surface to the lower lands; but these lower lands—and there appears to be a small area so affected—would be much benefited by the prompt removal therefrom of this and other surface water. One witness based his opinion in part on the supposition that no provision was made in the engineer's report for streams flowing into the river. It will be noted that the cost of this is estimated at $3,000 in the report, and such details are matters to be worked out in the permanent survey. *Laurence v. Board of Supervisors,* 151 Iowa 182. This estimate was not shown to be inadequate. Nearly all the excess water comes down the river and overflows or seeps into the lands

4. DRAINS: establishment: preliminary survey: sufficiency.

at times of heavy rainfalls. It is mainly to carry away these waters that adequate drainage is required.

5. WITNESSES: competency: drainage: adequacy of proposed plan. Many of the witnesses called by the objectors expressed the opinion that lands would not be benefited by the improvement; but this was on the assumption that the proposed ditch would not accomplish its purposes. None of appellees' witnesses, as a basis of opinions expressed, assumed that the ditch proposed would so carry off the water in all ordinary rainfalls as to avoid overflow and any considerable seepage therefrom and directly from the river, and also that drawn into the ditch as an outlet from the drainage systems, tile, open ditch, or both, to be constructed throughout the district. On the contrary, they appear to have first determined that the improvement would accomplish nothing in carrying away the water, and then to have testified to what necessarily must follow: that no benefit to the lands named would result. Our drainage laws, however, proceed upon the theory that scientific knowledge is essential to determine and pass upon the probable efficiency and adequacy and cost of a proposed drainage system. *Zinser v. Board of Supervisors*, 137 Iowa 660; *Hartshorn v. Wright County District Court*, 142 Iowa 72; *Shaw v. Nelson*, 150 Iowa 559; *Lyon v. Board of Supervisors*, 155 Iowa 367; *Mittman v. Farmer*, supra.

Without the report and plat of an engineer, found by the board of supervisors to be disinterested and competent, a drainage district may not be established nor an improvement ordered, nor can an improvement of this kind be constructed otherwise than as recommended by an engineer. In other words, the law recognizes the drainage of large bodies of land to present scientific problems which only an expert may be expected to successfully solve. So many matters bear thereon,—as the topography of the area to be

drained, of that surrounding, the amount of water coming on or through the same from the stream above or tributaries within and extending beyond the boundaries of the district, the extent of the rainfall and how distributed, other climatic conditions, to what extent an even as well as an increased fall will facilitate the passage of water first entering the ditch, and how this will influence the flow from beyond, and others,—that a person who has not made a special study of the subject is not qualified to express an opinion thereon of any considerable value. This is especially true where his viewpoint is limited to the immediate vicinity of his own locality, even though he may have had knowledge of conditions there for many years.

None of the witnesses called by the ob-

6. WITNESSES: competency: drainage: physical conditions, past and present.

jectors, except Ballard and Bannon, were shown to have possessed any special knowledge concerning drainage. And none other than these were qualified to express an opinion as to whether the improvement as contemplated would prove successful in carrying off the excess surface and river water: that is, the waters which interfere with the most profitable cultivation of the soil. This being so, their evidence that certain lands would not be benefited, or that certain tracts would be injured, was entitled to no consideration, save as this was indicated by the physical conditions described, or the recital of past conditions within their observation and memory. Opinions as to benefits or injury were not so limited, save in one or two instances as to the influence of water from the hills, and these related to a comparatively small area, and could not be accorded controlling importance.

From a careful examination of all this evidence, we are satisfied that the objectors failed to meet the burden of showing that the expense would exceed the benefits to result from the proposed improvement. Nor was there any evi-

dence that all the lands that would be benefited were not included. Some 40's were included which would derive but slight advantage from the excavation of the drainage canal. Possibly there are one or two tracts which would not receive any benefit. This alone would not be enough to defeat the organization of the district, or the drainage as proposed, and no claim is made that any of these should be excluded from the district in event of a reversal.

Nor is there any warrant in the record for the deduction that the area of the district is not sufficient to justify the expenditure. On the contrary, it appears that the soil throughout the district is of great fertility, and that approximately the whole area would be improved for cultivation and much of it nearly doubled in value, if the drainage should prove efficient. No evidence was adduced tending to show that lands which would be benefited were not included, nor that the estimated cost would not cover the necessary expenditure. Our conclusion is that the first four findings of the trial court are without substantial support in the record, and they should be and are set aside.

7. DRAINS : establishment : appeal : inadequate and speculative scheme.

Our trouble has been with the fifth finding: that the ditch proposed is inadequate to carry off the usual and ordinary floods. The engineer in his report seems doubtful on this point, for he asserts that he neither claims nor expects the channel recommended to carry all the water when there are heavy flood flows. Greater capacity would be required. He estimates that it will carry away nine tenths of such water, and expresses the opinion that "nature will enlarge the channel from year to year" until adequate for the needs. As he suggests, it is often more economical to allow a ditch to wash out than to remove the earth by the hand of man. But nature does not always meet expectations. Such improvements always are in a measure experimental. Some chances must be taken.

The best that can be done is to ascertain all the facts possible, and from these and deducible scientific data determine what is essential to the attainment of the results contemplated. The certainty of conclusions reached often depends almost entirely upon the accuracy of the finding of such facts and data. Here it is not proposed to do that which is thus found to be essential. Much of this is left to what is said to be the course of nature. The percentage of fall is the same throughout the entire length of the ditch, and doubtless, as claimed, the flow would be likely to be more rapid than were the bottom variable, and straight banks would avoid much of the friction of a sinuous stream. The increase in the fall would increase the velocity of the flow, and probably result in carrying off most of the water first falling in heavy rainstorms over the district (especially when properly drained into the ditch) before the bulk of the waters accumulated in the river above would come down. The probable consequence to be anticipated is that water would pass through the proposed ditch much more rapidly than by way of the river. But a cross section of the ditch would be only 384 square feet, and the velocity, 5.56 feet per second; so that, when the ditch would be full, but 2,135 cubic feet of water would pass any given point per second. The engineer estimated the average width of the river at 87½ feet at the top, 55 feet at the bottom, and the average depth at 12 feet, and was of the opinion that the velocity of the flow is 3.4 feet per second; and there is nothing in the record to the contrary. Its capacity, then, is 2,907 cubic feet per second, or 772 cubic feet more than would pass a given point through the ditch. Probably, owing to the uneven bottom and banks of the river, and the more rapid drainage into the ditch from tributaries and other drains, there would not be quite this difference in capacity.

It is not claimed that the ditch will carry away all the water. The engineer estimates that about nine tenths of it

will be taken care of, and that, when relatively widened, it would carry off much more than the river bed. How long the process of widening must continue in order to render the ditch of adequate capacity is not indicated by his testimony, and this uncertainty is somewhat emphasized by what he says:

"In other words, time is cheaper than money, and it is better to cut a small ditch, and let the water widen the ditch out to sufficient capacity in a few years to carry all of the flood water. You cannot tell in advance just how rapidly it will do it, because it depends on the amount of water that is coming down the channel and the frequency of the floods. The widening process goes on more rapidly during the freezing of the banks. They will freeze perhaps two feet, and then, when the frost comes out, they will slough off, and the earth is carried out by the water. That is the most rapid way that the stream widens. When a ditch attains a maximum of width, it will not widen further. It will stop when the widening of the channel is sufficient to carry the flow of water that comes down. What causes it to stop is that the flow of water in the channel being widened out in the channel so that it is thin, and the friction of the water acting on the banks, is sufficient to overcome a tendency to scour. It will eventually widen out to about the same width the old channel now is. The widening process will go on quite rapidly at first, then gradually decrease; and it will be a number of years before the ultimate size of the channel is reached. I don't look for it to get much deeper, for the reason that, as it widens, the thread of water in the bottom becomes more shallow, and it is the depth of the water flowing in the bottom of the stream that gives it a current sufficient to scour the bottom.　＊　＊　＊ You can't figure in advance the uniformity with which a channel will be widened by the action of the water. To make the enlargement successful, it must be uniform throughout

the district. If, one fourth of the distance across this valley, the ground and soil should be hard and tenacious, and would not yield, and would remain substantially the size it has now cut, the proposed ditch would still be discharging about 2,135 second feet, if it did not enlarge any. The value of drainage to the border 40's of which I spoke a while ago, depends upon relief from flood water that comes down from the hills. If the old ditch was discharging more water at the south end than the new ditch will, then the new ditch will not facilitate the drainage of the border 40's. My plan is to drop earth on the lower side, and fill up the old river so as to force the water down the new channel and confine the water to the new channel. One or the other of these ditches is going to predominate. If the new ditch takes the water, it will be determined by the question of the discharge of the new; and if the old ditch predominates and continues to carry the water, the discharge from the old ditch would determine the efficiency of the drainage. It is more or less problematic. I cannot guarantee that all of the things will be carried out."

Bannon, an engineer called by appellees, was of opinion that the river as it is would carry off more water than the proposed ditch; that, were the water kept within the ditch, it would make a sufficient channel by erosion, but that this would be along the sides, and it probably would not deepen; that the proposed ditch would be large enough for normal conditions, but not to carry off the floods that come down during or after heavy rainfalls; that the old channel would fill about half way and remain that way, and "you would have a stream, part of it going through the new and part of it through the old channel." The proposed ditch crosses the river forty times, and with reference thereto this witness says:

"The crossing of one of these streams with the other will retard the flow of the water in a short time: one or the other will be open to take the water. They won't both flow open all the time. The new ditch will carry the water down to where they make the crossing. They are bound to interfere with each other. One ditch will stop while the other has the water, the water goes through the other one, or else they will fill in together, which is a fact, and then it is going into the one furnishing the least resistance. Water is like an electrical current: it will take the shortest route out of there. If the big ditch is larger, and offers the least resistance to that volume of water, the tendency will be to go into the old ditch. It will go that way in course of two or three floods, one or the other is going to take precedence over the other. In some places the new ditch will have a little edge, owing to the opening into the stream, and it will come down to the next place where there is the least resistance offered, and you will have the water in that ditch; in one place you will have water in the old ditch, and another place, water in the new ditch, and you will have a ditch there, part new ditch and part old ditch."

Another engineer called by appellees, Ballard, was of opinion that:

"The old channel would carry the greater volume of water. The new one would possibly carry water at flood stages, but it would be retarded at each one of the forty crossings. The velocity we have given the old river, of 5.56, would not carry the same velocity where the old river crosses the proposed ditch. It would be retarded by the friction of the cross currents, possibly 40 per cent. The bottom of the Dean ditch being no deeper than the bottom of the old river bed, one or the other of the channels would be tearing out and the other be blocked. Probably a part of that distance, the greater volume of water would predominate, and fill the old ditch for years to come. The water

comes down loaded with silt, and probably in some of these bends and fill up, but not more than 70 per cent. of the opening.   *   *   *   In my judgment, if the ditch proposed by Mr. Dean is constructed of the sizes given, it would not take care of the water of the large floods that come down the river.   It would obstruct a good deal of surface water from entering the river."

The evidence discloses that the soil, for about one fifth of the distance, is what is known as gumbo; that this does not readily yield to erosion; and that it probably would only fall away by sloughing off after freezing and thawing. The plan of the engineer in charge of filling the river on the lower line of the ditch would seem sufficient to keep the current within the ditch proposed, especially as the tendency of the water would be to move forward rather than turn. Indeed, the plan seems, as declared by Bannon, well worked out, except in the matter of the capacity of the proposed improvement.   The river overflows from heavy rainfalls, which ordinarily are frequent during the spring and summer months; and to excavate a ditch with less capacity for passage of waters than the river bed, and rely on the action of the waters to widen it to such an extent as that it will carry off, not only what the river carries, but the overflow, would be taking a risk hardly to be approved, and never in the absence of a showing that this is likely to happen within a reasonable time, or that the risk might not be avoided by the excavation of a more adequate waterway.   The record before us does not indicate within what time the proposed ditch would in all reasonable probability widen sufficiently to carry off all waters coming down the river from above, together with that from its tributaries, drainage and rainfalls within the district (excepting always extraordinary floods),—that is, accomplish the purposes of its construction; and whether this would ever happen under the cir-

cumstances shown is too much a matter of speculation and conjecture to warrant the large expenditure of money contemplated.

Had the plan called for the excavation of a drainage ditch with the carrying capacity of the river, or slightly smaller (enough to offset its irregularities and the erosion likely from increased velocity of the current), or somewhat larger, we should not have hesitated to approve it. The matter of drainage, aside from its bearing on the public health or welfare, is largely a business proposition, and should proceed only on the probabilities of success; and expenditure should not be pinched to the extent of jeopardizing the success of the enterprise. The record leaves little or no doubt that, with the ditch proposed approximately a third, or possibly even a fourth, larger, the improvement might have been made with reasonable assurance of its adequacy for the complete drainage of the district. The expense would have been considerably greater, but not as much as the benefits conferred would have justified. The evidence indicates that the soil of the district is of exceeding fertility, and that practically all of it would be much benefited, and a very large area, now not dry enough, rendered suitable for intensive cultivation. Our conclusion is that the ditch as proposed would be experimental, with the probabilities of its efficiency doubtful and speculative, and for this reason the decree of the district court is sustained. The other findings of the trial court are set aside and reversed. Of course, the question as to relative expense and benefit will be open in event of the proposal of the construction hereafter of a ditch of greater capacity. As so modified, the decree is affirmed.

*Modified and affirmed.*

GAYNOR, C. J., EVANS and SALINGER, JJ., concur.