Filed 7/9/19 (unmodified opinion attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Amador)

----

| | |
|---|---|
| HOWARD JARVIS TAXPAYERS ASSOCIATION et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> AMADOR WATER AGENCY et al., <br><br> Defendants and Respondents. | C082079 <br><br> (Super. Ct. No. 16CV9564) <br><br> MODIFICATION OF OPINION UPON DENIAL OF REHEARING [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on June 14, 2019, be modified on page 28 of the opinion, before the "DISPOSITION" on line 8, to insert the following:

In a petition for rehearing, appellants challenge our conclusion that, at the time the referendum provision was adopted in 1911, the word "tax" *generally* had an inclusive definition that included user fees. However, appellants rely on case law distinguishing

1

between taxes and fees for specific purposes not at issue in this appeal, e.g. method of enforcement. Appellants ignore that the cited case law actually supports our conclusion that taxes *generally* included assessments. Thus, *Wood v. Brady* (1885) 68 Cal. 78, which held that foreclosure of a street assessment lien did not extinguish prior liens, stated: " '*While the power of assessment comes from the general power of taxation*, it must not be confounded with it,' . . . '*In their origin and legal or constitutional complexion they are the same*; but in the mode of their exercise, and in the effect of such exercise upon the property of the taxpayer, they are essentially different.' " (*Id*. at pp. 79-80, italics added.) Assessments levied for the benefit of property situated within the assessment district were not collected like public taxes but were subject to specific enforcement statutes for collection of such assessments. (*Ibid*.) Here, appellants' petition for rehearing quotes the language about taxes and assessments being different but omits the language about their similarity.

Appellants argue that our cited cases about taxes generally including assessments are inconsequential, because we cannot apply this common usage without a "clear, unambiguous indication" that this was the People's specific intent in adopting the 1911 constitutional provision, and the cited cases did not so hold. Appellants cite *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, where an initiative petition sought a *special* election to impose taxes on medical marijuana dispensaries, but the city invoked the constitutional provision that a tax proposed by "local government" was to be submitted at the next *general* election. (*Id*. at pp. 931, 937.) The Supreme Court held "local government" did not include "the electorate." In doing so, the Court noted that the "common understanding" of the term "local government" did not readily lend itself to include the electorate. (*Id*. at p. 937.) Thus, common usage of words is a factor in construing the constitutional provision. Here, the common usage of the term "taxes" in 1911 generally included user fees and assessments.

2

Appellants claim the voters did signal a conscious decision to limit the exception to taxes, because they used the term "tax levies" in the 1911 referendum provision, and "the sense of the word [levy]" in 1911 meant collecting the money by seizing and selling property. However, appellants fail to address the 1891 case cited in our opinion, which said that "levying" a tax included both assessing and collecting it. (*City of San Luis Obispo v. Pettit*, *supra*, 87 Cal. at p. 503.)

Appellants' petition for rehearing is denied.


BY THE COURT:



_____
BLEASE, Acting P. J.



_____
HULL, J.



I dissent from the modification and would grant the request for rehearing.



_____
MURRAY, J.

Filed 6/14/19 (unmodified opinion)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Amador)

----

|  |  |
|---|---|
| HOWARD JARVIS TAXPAYERS ASSOCIATION et al., | C082079 |
| Plaintiffs and Appellants, | (Super. Ct. No. 16CV9564) |
| v. | |
| AMADOR WATER AGENCY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Amador County, Don F. Howard, Judge. (Assigned by the Chairperson of the Judicial Council.) Affirmed.

Howard Jarvis Taxpayers Foundation, Jonathan M. Coupal, Trevor A. Grimm, Timothy A. Bittle, and Brittany A. Sitzer for Plaintiffs and Appellants.

Churchwell White, Steven G. Churchwell, Nubia I. Goldstein, and Embert P. Madison, Jr.,; Bartkiewicz, Kronick & Shanahan, Joshua M. Horowitz, and Andrew J. Ramos for Defendants and Respondents.

Daniel S. Hentschke; Best Best & Krieger, and Kelly J. Salt for Association of California Water Agencies, California Association of Sanitation Agencies, California Special Districts Association, California State Association of Counties, and League of California Cities as Amici Curiae on behalf of Defendants and Respondents.

The Metropolitan Water District of Southern California, Marcia Scully, Heather C. Beatty, and Patricia J. Quilizapa for The Metropolitan Water District of Southern California as Amicus Curiae on behalf of Defendants and Respondents.

1

Citizens submitted a referendum petition to challenge Amador Water Agency's Board Resolution No. 2015-19, adopting new water service rates for Agency customers. (Cal. Const., art. II, § 9 [voters have referendum power to approve or reject state statutes except, e.g., tax levies]; Cal. Const., art. II, § 11 [referendum power may be exercised by city and county electors under procedures provided by Legislature]; Water Code App., § 95-3.8 [water agency has power to fix and collect rates and charges for its services]; Water Code App., § 95-7.3 [water agency electors have initiative and referendum powers as to agency enactments].)

The Clerk of the Agency rejected the referendum petition and refused to place it on an election ballot, on the grounds that (1) the petition was "confusing," and (2) the rate change, while subject to challenge by initiative, is not subject to referendum. (Elec. Code, §§ 9114, 9144-9146 [upon presentation of valid referendum petition, board shall repeal ordinance or submit it to voters at an election].)

Appellants Howard Jarvis Taxpayers Association, Charlotte Asher, and Laura Boggs appeal from the trial court's denial of their petition for a peremptory writ of mandate (Code Civ. Proc., § 1085) against Amador Water Agency, its Clerk, and its Board of Directors (collectively "the Agency"). Appellants argue (1) the Clerk exceeded her ministerial duties by declaring the petition confusing, and (2) referendum is an appropriate avenue to challenge the new water rates.

Because we must avoid deciding constitutional issues if other dispositive grounds are available (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230), we first address the Clerk's finding that the petition was confusing. We conclude she exceeded the scope of her ministerial duty and should have certified the referendum petition as adequate.

As to the constitutional question, we allowed amici curiae briefing to be filed in favor of the Agency by Metropolitan Water District of Southern California and a joint brief by Association of California Water Agencies, California Association of Sanitation

2

Agencies, California Special Districts Association, California State Association of Counties, and League of California Cities.

We conclude the Resolution is not subject to referendum. We reached a different conclusion in a different case currently under California Supreme Court review. (*Wilde v. City of Dunsmuir* (2018) 29 Cal.App.5th 158, review granted Jan. 30, 2019, S252915.)

Under the general constitutional referendum provision, adopted by voters and the Legislature in 1911: "The referendum is the power of the electors to approve or reject statutes or parts of statutes *except* urgency statutes, statutes calling elections, and *statutes providing for tax levies* or appropriations *for usual current expenses of the State*." (Cal. Const., art. II, § 9, subd. (a), italics added, hereafter art. II, § 9; *Rossi v. Brown* (1995) 9 Cal.4th 688, 697, fn. 3 (*Rossi*) [1911 adoption].) "One of the reasons, if not the chief reason, why the Constitution excepts from the referendum power acts of the Legislature providing for tax levies or appropriations for the usual current expenses of the state is to prevent disruption of its operations by interference with the administration of its fiscal powers and policies." (*Geiger v. Board of Supervisors of Butte County* (1957) 48 Cal.2d 832, 839-840 (*Geiger*).)

This general referendum exception (art. II, § 9) also applies to local taxes by local legislative enactment. (Cal. Const., art. 2, § 11 [Legislature may provide procedures for exercise of referendum powers by city or county electors]; *Geiger, supra,* 48 Cal.2d at p. 836 [exception from referendum for state taxes applies to local taxes].) The statutory right to referendum (Water Code App., § 95-7.3) cannot afford broader rights than the constitutional provision. (*Geiger,* at p. 837.)

While constitutional law since the 1978 passage of Proposition 13 has sharpened distinctions between "taxes" and other exactions (assessments, fees or charges) in the context of property taxes and property-related fees, those distinctions do not necessarily govern the interpretation of the general referendum provision (art. II, § 9) -- which dates back to 1911 (*Perry v. Brown* (2011) 52 Cal.4th 1116, 1139-1140) -- because the

3

meaning of a word in one constitutional provision may differ from the same word in a different constitutional provision. (*Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 213-217 (*Bighorn*) ["the words 'fee' and 'charge,' which appear in both articles [XIII C and XIII D], may well have been intended to have a narrower, more restrictive meaning in article XIII D"].)

At the time the voters and Legislature adopted the general referendum provision in 1911 (*Rossi, supra*, 9 Cal.4th at p. 697, fn. 3), the word "tax" generally had an inclusive definition that included exactions for assessments, fees or charges, including user fees for government services, even where they conferred a special benefit on payors that was not conferred on other citizens. (E.g., *Yosemite Lumber Co. v. Industrial Acc. Commission of Cal.* (1922) 187 Cal. 774, 783 [act exacting from employers a sum to be used for workers' compensation is in reality a tax under the definition that a tax "includes every charge upon persons or property, imposed by or under the authority of the legislature, for public purposes"]; *Los Angeles County Flood Control Dist. v. Hamilton* (1917) 177 Cal. 119, 128 ["In its broad meaning the word ['tax'] includes both general taxes and special assessments"].) We presume voters and legislators were aware of the inclusive use of the term "tax" at the time the general constitutional provision was adopted. (*Santos v. Brown* (2015) 238 Cal.App.4th 398, 410 (*Santos*).)

We accordingly conclude the term "tax" in the general referendum provision (art. II, § 9) encompasses water service fees. Since the water fees were never subject to referendum, we do not address the Agency's arguments that the post-Proposition-13 passage of Proposition 218 (Cal. Const., arts. XIII C, XIII D) implicitly repealed a pre-existing right to challenge fees by referendum.

Our conclusion that the Agency's water user fees are "taxes" within the meaning of the general referendum provision does not mean they are taxes for other constitutional purposes. Such fees are not "taxes" for purposes of Proposition 13 or its progeny (Propositions 62, 218, and 26). (Cal. Const., art. XIII C [voter approval for local tax

4

levies], art. XIII D [property-related fee reform].)  Article XIII C, section 1, subdivision (e), expressly excludes from the term "tax" any charges for special benefits, products, or services provided directly to payors that are not provided to those not charged.  Article XIII D also expressly distinguishes between taxes and assessments, fees and charges, including user fees for property-related services.  (Cal. Const., art. XIII D, §§ 2, 3, 6; see also, *Bighorn, supra,* 39 Cal.4th at p. 217 [Proposition 218 allows use of the initiative power to challenge water delivery charges, which are fees or charges rather than taxes].)  Our decision in this appeal has no effect on those principles.

In reaching our conclusion that the Resolution is not subject to referendum, we are mindful of our duty to construe constitutional powers liberally in favor of the people's right to exercise the reserved powers of initiative and referendum.  (*Rossi, supra*, 9 Cal.4th 688 at p. 695.)  "The initiative and referendum are not rights 'granted the people, but . . . power[s] reserved by them.  Declaring it "the duty of the courts to jealously guard this right of the people" [citation], the courts have described the initiative and referendum as articulating "one of the most precious rights of our democratic process" [citation].  "[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right not be improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it." ' [Citations.]" (*Ibid*.)

We are also mindful that we must not adopt a construction of the general referendum provision that would conflict with or impede other constitutional provisions. (*Santos, supra*, 238 Cal.App.4th at p. 410 [we do not read the provision in isolation but harmonize it with the entire scheme to retain its effectiveness].)

Our conclusion that these water fees are not subject to referendum is in harmony with Proposition 13 law allowing imposition or increase of water fees without pre-enactment voter approval.  (Cal. Const., art. XIII D, § 6, subd. (c) ["Except for fees or charges for sewer, water, and refuse collection services, no property-related fee or charge

5

shall be imposed or increased unless and until that fee or charge is submitted and approved by a majority vote of the property owners of the property subject to the fee or charge or, at the option of the agency, by a two-thirds vote of the electorate residing in the affected area"].)

Moreover, our conclusion does not interfere with taxpayers' rights to challenge water service fees under the other constitutional protections afforded by Proposition 13 and its progeny. (Cal. Const., art. XIII C, § 3 [taxpayers may challenge local taxes, assessments, fees and charges by the initiative process]; Cal. Const., art. XIII D, § 6, subd. (a) [agency shall conduct public hearing on proposed fees and shall not impose them if written protests are presented by a majority of property owners].)

Because we conclude the Resolution is not subject to referendum, we affirm the judgment denying the writ petition. (*Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 904 [appellate court has discretion to treat statement of decision as appealable final judgment].)

## FACTS AND PROCEEDINGS

The Legislature created the Amador Water Agency Act in 1959 (Water Code App., §§ 95-1 to 95-29; Stats. 1959, ch. 2137), as a special district to provide water and wastewater and storm drain services to Amador County "for the conservation, development, control and use of said water for the public good and for the protection of life and property therein." (Water Code App., § 95-27.)

"The agency shall have the power by resolution or ordinance to adopt regulations respecting the exercise of its powers and the carrying out of its purposes, and to fix and collect rates and charges for the providing or the availability of any service it is authorized to provide or make available or for the sale, lease or other disposition of water or other product of its works or operations, including standby charges and connection charges." (Water Code App., § 95-3.8.) The Agency can also levy ad valorem taxes if

6

approved by voters. (Water Code App., §95-14.) The Agency's powers are exercised by its Board of Directors. (Water Code App., § 95-3.) The voters have the powers of initiative and referendum to challenge Agency ordinances. (Water Code App., § 95-7.3 ["The initiative and referendum powers are hereby granted to the electors of the agency to be exercised in relation to the enactment or rejection of agency ordinances in accordance with the procedure established by the laws of this State for the exercise of such powers in relation to counties"].)

In 2015, after several years of drought, the Agency proposed Resolution 2015-19, "ADOPTING NEW UNIFORM WATER RATES FOR SINGLE-FAMILY CUSTOMERS, TEMPORARY WATER SHORTAGE RATE SURCHARGES ON WATER USAGE, METERED WATER RATES FOR FLAT-RATE WATER CUSTOMERS, AND A SCHEDULE OF ANNUAL AUTOMATIC INFLATIONARY RATE ADJUSTMENTS."

Before adopting the Resolution, the Agency complied with notice and protest procedures instituted in 1996 by Proposition 218, requiring the Agency to give written notice to property owners of proposals to impose or increase fees and charges and to hold a public hearing. (Cal. Const., art. XIII D, § 6, subd. (a).) The Agency must consider all protests at the public hearing, and "[i]f written protests against the proposed fee or charge are presented by a majority of owners of the identified parcels, the agency shall not impose the fee or charge." (*Id*. at subd. (a)(2).) In contrast, a referendum petition need be signed only by electors equal in number to at least 10 percent of the votes cast in the county for all candidates for Governor at the last gubernatorial election. (Cal. Const., art. II, § 9, subd. (b); Elec. Code, § 9144.)

Of the 7,050 Agency customers that were sent the written notice and mail-in protest ballots, only about 1.3 percent protested the fee increase.

On July 21, 2015, the Agency adopted the Resolution, effective August 1, 2015. The Resolution adopted a new uniform rate for single-family customers of $2.30 per CCF

7

(100 cubic feet or 748 gallons), replacing the former tiered rates of (1) $2.02 per CCF for usage of 0 to 10 CCFs/month; (2) $2.52 per CCF for 11 to 40 CCFs/month; and (3) $3.15 per CCF for more than 40 CCFs/month.  The Resolution also adopted temporary water shortage rate surcharges on water usage, increasing the normal $2.30 per CCF charge for general service customers to a range of $2.71 to $4.03 per CCF (an increase of 18 percent to 75 percent), depending on the stage of water shortage.  The Resolution also transitioned the small number of remaining flat-rate customers to metered rates.  Finally, the Resolution adopted a new five-year schedule of annual automatic inflationary rate adjustments, that extended the previous schedule through July 1, 2020.  There was no change to the inflation adjustment calculation, which was capped at three percent and could not result in rates exceeding the cost of providing water service.  (Gov. Code, § 53756 [water agency may adopt automatic adjustments for inflation, subject to conditions].)

The Board determined these changes were necessary "to cover the ongoing and increasing costs of providing water service, including operation and maintenance costs, debt service obligations, and water system replacement, rehabilitation, repair and upgrade needs.  These costs include labor costs, regulatory costs, collection costs, administrative and customer service costs, and costs related to facilities replacement, rehabilitation, repair and upgrade of the Agency's water systems.  Revenues derived from the adopted rates and charges shall be used only for purposes related to the Agency's water systems."

Citizens' group Ratepayers Protection Alliance (RPA or Alliance) circulated a referendum petition challenging the Resolution.

The Alliance presented signed petitions to the Board's Clerk on August 19, 2015.  Attached to the signature pages were copies of (1) the entire text of Resolution No. 2015-19 with attached exhibits, (2) "FY 15-16 [fiscal year 2015-2016] Water Rate Update and Water Shortage Financial Strategy" (the Update), and (3) "System-Wide Cost of Service and Water Rate Study" (the Study).  The latter two documents were expressly mentioned

8

in the Resolution, which stated the Board had reviewed and accepted the Update, and that debt service reductions would be calculated on the same principles as those contained in the 2013 Study.

The signature pages of the petition stated it was a "REFERENDUM AGAINST A RESOLUTION PASSED BY THE AMADOR WATER AGENCY BOARD OF DIRECTORS," and the undersigned voters "protest the adoption of Resolution Number 2015-19 (A resolution adopting new uniform water rates for single family customers, temporary water shortage rate surcharges on water usage, metered water rates for flat-rate water customers, and a schedule of annual automatic inflationary rate adjustments.), adopted by the [Board] on July 21, 2015.  We hereby request that Resolution Number 2015-19 be reconsidered and repealed by the Board of Directors or that the resolution be submitted to a vote of the People of Amador County at the next regular election.  The title and text of the 'FY 15-16 Water Rate Update and Water Shortage Financial Strategy' and 'System-Wide Cost of Service and Water Rate Study' are below in their entirety."

Thus, though the referendum petition as presented to the Clerk attached the full text of the Resolution, the signature page expressly mentioned attachment of the Update and Study without expressly mentioning that the text of the Resolution was also attached.

The County Elections Department verified that the petitions contained a sufficient number of valid signatures.

Nevertheless, the Board's Clerk, Cris Thompson, in a letter to RPA dated September 30, 2015, said the Clerk "on advice of counsel" declined to authenticate or certify the referendum for inclusion on the ballot at a general election for three independent reasons:

1.  The referendum petition attempts to exercise a power the Board does not possess, and consequently voters do not possess, to set a rate insufficient to cover Agency expenses.  This asserted ground has fallen by the wayside and is not at issue on appeal.

9

2. The Clerk next asserted: "In 1996, voters passed Proposition 218, which added articles XIII C and XIII D to the California Constitution. These articles ensure that prior to increasing any property related fee, here water rates, an agency must comply with article XIII D['s] . . . [pre-adoption protest procedure], effectively allowing voters a referendum vote prior to enactment. Once the rate has been properly adopted, the constitutionally mandated method for repealing these charges is an initiative. (Cal. Const., art. XIII C, § 3; *Bighorn*[, *supra*,] 39 Cal.4th 205.) The submitted petition is for a referendum, not an initiative. It may not be rebranded an initiative post-signature collection because the circulated document does not contain a title and summary issued before circulation as required by the initiative statutes."

3. The Clerk next asserted: "Elections Code section 9147(b) states 'Each section of the referendum petition shall contain the title and text of the ordinance or the portion of the ordinance which is the subject of the referendum.' One of the main purposes of this requirement is to prevent voter confusion about what the referendum is attempting to repeal. [Citation.] The text of the petition section [sic] states, '[T]he title and text of the "FY 15-16 Water Rate Update and Water Shortage Financial Strategy" and "System-Wide Cost of Service and Water Rate Study" are below in their entirety.' These documents are not the resolution that the proponents are seeking to repeal and thus this misstatement of the document being referred sows voter confusion. They are instead documents referred to in the resolution. Their inclusion 'below in their entirety' without explanation that they are not the resolution being repealed, nor that the resolution is also attached, renders the petition text facially invalid."

Thus, by complaining the petition did not "explain[]" that "the resolution is also attached," the Clerk appeared to concede that the Resolution *was* attached to the petition.

Upon appellants' petition for a writ of mandate, the trial court took judicial notice of documents, issued an alternative writ, and considered evidence and argument for a peremptory writ.

While the Clerk's letter claimed the referendum petition was confusing for failing to state the Resolution was attached, the Agency changed its theory in the trial court, where it now claimed the Resolution was *not* attached to the referendum petition at the time signatures were gathered but instead was tacked on later when the papers were submitted to the Agency. As we set forth in our discussion *post*, this new theory was based on assumptions and speculation rather than evidence.

The Agency also argued there is no right to referendum of the Resolution because Proposition 218's pre-adoption protest procedure replaced the referendum power, and Proposition 218 expressly preserved the initiative power without mentioning the referendum power.

After written memoranda and a hearing (unreported except for the brief statement of decision), the trial court denied a peremptory writ on the ground that the Resolution was not subject to the referendum power and could be challenged by initiative only. The trial court also "agree[d]" with the Agency that the petition "created confusion," though the court did not state in what respect it was confusing.

We denied a petition for writ of mandate without prejudice to the filing of this appeal.

DISCUSSION

I

*Standard of Review*

To obtain a writ of mandate under Code of Civil Procedure section 1085, the petitioner must show (1) a clear, present, ministerial duty on the part of the respondent and (2) a correlative clear, present, and beneficial right in the petitioner to the performance of that duty. (*Alliance for a Better Downtown Millbrae v. Wade* (2003) 108 Cal.App.4th 123, 128-129 (*Alliance*).) A ministerial duty is an act that a public officer is obligated to perform in a prescribed manner required by law when a given state

11

of facts exists. (*Id*. at p. 129.) On appeal following a trial court's decision on a petition for writ of mandate, we review the record to determine whether the trial court's findings are supported by substantial evidence, but we review de novo questions of law involving statutory and constitutional interpretation. (*Ibid*.; *Baba v. Board of Supervisors of the City & County of San Francisco* (2004) 124 Cal.App.4th 504, 512.)

II

*The Clerk Exceeded the Scope of Her Ministerial Duty*

Appellants contend the Clerk exceeded her ministerial duty by finding the referendum petition facially insufficient under the Elections Code. We agree with appellants and therefore cannot sustain the judgment on this ground.

Elections Code section 9147, subdivision (b), states "Each section of the referendum petition shall contain the title and text of the ordinance or the portion of the ordinance which is the subject of the referendum." Though this statute addresses county elections, the Water Code makes it applicable to the Agency. (Water Code App., § 95-7.3 ["The initiative and referendum powers are hereby granted to the electors of the agency to be exercised in relation to the enactment or rejection of agency ordinances in accordance with the procedure established by the laws of this State for the exercise of such powers in relation to counties"].)

The Clerk has a ministerial duty to accept a petition when, as here, it is turned in with the text attached and the circulator submits a declaration that he or she circulated the petition as it was turned in. (*Alliance, supra*, 108 Cal.App.4th at p. 133.) The parties agree our review is de novo. (*Lin v. City of Pleasanton* (2009) 176 Cal.App.4th 408, 416-417.)

Here, the full text of the Resolution was attached to the referendum petition submitted to the Clerk, thus satisfying Election Code section 9147's requirement that the petition "contain" the title and text of the ordinance. The statute does not additionally

12

require the petition also to *expressly state* that the text is attached.  That the petition expressly stated the Update and Study were attached does not render the petition inadequate.

The Agency changed its theory in the trial court, now claiming the Resolution was *not* attached to the referendum petition at the time signatures were gathered but instead was tacked on later when the papers were submitted to the Agency.

As supposed evidence for this new factual theory, Clerk Cris Thompson attested that upon reviewing the petition and signatures when they were submitted, "I noticed that the separate attachments stapled to the referendum petition were significantly different from the pages containing the signatures.  The petition form with signatures had marks which indicate the signature pages had been circulated.  For example, there were crease marks where the document had been folded and similar markings associated with frequent use.  In contrast, the copy of Resolution 2015-19 and its attachments were in pristine condition.  Based on my review of the entire referendum petition, I believe the full-text of Resolution 2015-19, with the appropriate attachments, was attached after the signatures were collected."

However, Alliance member Bill Condrashoff submitted a declaration that he personally printed, assembled, and distributed all petition packets with the Resolution, Update, and Study attached.  All packets were returned still fastened, except for one packet which he discarded.

The Clerk also submitted to the court letters from citizens Frank Busi and John Berglund asking that their signatures be removed from the referendum petition.  Contrary to the Agency's contention, neither letter "assert[ed] the full text was not attached during circulation."  Rather, Mr. Busi wrote, "I was stopped by a man circulating the petition who pressured me to sign it, telling me his reasons.  He didn't show me Resolution 2015-19 or the rate studies referred to in the petition.  I was in a hurry at the time, and I signed it to get on with my business."  He changed his mind and wanted his name deleted.  Mr.

13

Berglund's letter said, "The only information that I saw before signing the petition was a flyer from the group circulating the petition indicating water bills would go up nearly 150%. I was not shown Resolution 2015-19 or the rate studies referred to in the petition." "On further research," he changed his mind and wanted his name removed.

Thus, neither Busi nor Berglund said the Resolution was not attached to the referendum petition.

On appeal, the Agency says we must imply findings in favor of the trial court's decision and cites *In re Marriage of Dancy* (2000) 82 Cal.App.4th 1142, which held that, where no statement of decision is requested and there is a conflict in the evidence, the reviewing court will infer findings in favor of the judgment, and review is limited to determining whether substantial evidence supports those implied findings. (*Id.* at p. 1159.) Here, however, we do not have a conflict in the evidence but rather a deficiency in the Agency's evidence because the factual finding that the Agency asks us to imply -- that the referendum petition was circulated without the Resolution attached -- is unsupported by *any* evidence.

The new claim that the text was unattached was merely the Clerk's own belated "belie[f]," based on the fact that the pages of the text did not have crease marks or other "markings associated with frequent use," like the signature pages did.

The Clerk's "belief" does not justify her refusal to do her ministerial duty to accept a petition turned in with the Resolution attached and the circulator's declaration that he circulated the petition as it was turned in. I*n Alliance* the city clerk refused to certify an initiative petition, in part because she believed the full text of the initiative had not been circulated with each signature sheet (Elec. Code, §§ 9201, 9207). Her "belief" was based on her deductions from four pieces of evidence: (1) that in some instances, "the signature page showed greater wear than the full text page and notice of intention page;" (2) unidentified third parties said they saw some petitions circulated without the full text, (3) a folder containing signature pages without the full text was left in the city

14

council chambers, and (4) the clerk believed the proponents had violated the Elections Code in the past on unrelated matters. (*Alliance, supra*, 108 Cal.App.4th at pp. 133-134.)

The appellate court held the trial court properly issued a writ of mandate directing the clerk to certify the petition, because the clerk did not have authority to make a discretionary evaluation of evidence to reach a factual conclusion not evident from the face of the petition. (*Alliance, supra*, 108 Cal.App.4th at p. 127.) The clerk's deduction, including that the signature page showed greater wear, was "fundamentally different from the ministerial duties countenanced by [case law]. It involves not a straightforward comparison of the submitted petition with clear statutory directives . . . but a discretionary evaluation of evidence, including evidence extrinsic to the Petition itself, to reach a factual conclusion not evident from the face of the Petition. . . . [R]easonable minds could differ as to what inferences to draw from the evidence before the city clerk. . . . The city clerk's decision involves the sort of discretionary, adjudicatory decisionmaking reserved for judges and juries." (*Id*. at p. 134, fn. omitted.) This does not leave petition gatherers unchecked; "courts offer an adequate forum for enforcing the provisions of the Elections Code because proposed measures are susceptible to legal challenge by interested parties. [Citations.]" (*Id*. at pp. 135-136.)

Here, reasonable minds could differ as to what inferences to draw from the fact that the signature pages show more sign of wear than the copies of the Resolution text. No law requires citizens to read the entire petition including all attachments before signing a petition. Indeed, the Agency's own evidence, i.e., Mr. Busi's letter, reflects a common experience of persons asked to sign petitions in public places: "I was in a hurry at the time, and I signed it to get on with my business." The extra wear on the signature pages is to be expected because each packet had 10 signature pages, and as they filled up, each page would be folded back to reveal a new signature page.

We conclude the Clerk was not authorized to reject the referendum petition.

15

III

*Appellants Do Not Have a Right to Challenge the Resolution by Referendum*

Appellants contend the constitutional referendum power is available to challenge this Resolution setting new water rates for Agency customers.

The parties argue whether or not Proposition 218 implicitly repealed the constitutional right to challenge water charges by referendum. The Agency says yes; appellants say no. But these arguments assume there was a right to referendum of such charges before Proposition 218. We conclude there was no such right.

The general constitutional provision for referenda is found in California Constitution, article II, section 9, subdivision (a), which provides: "The referendum is the power of the electors to approve or reject statutes or parts of statutes *except* urgency statutes, statutes calling for elections, and *statutes providing for tax levies* or appropriations for usual current expenses of the State." (Italics added.) Though this provision refers to State expenses, it extends to local governments. (Cal. Const., art. 2, § 11 [Legislature may provide procedures for exercise of referendum powers by city or county electors]; *Geiger, supra*, 48 Cal.2d at p. 836 [exemption from referendum for state taxes applies to county taxes].)

The general referendum provision in article II, section 9, dates to 1911, when the electorate and the Legislature revised the California Constitution to "reserve to [the people] the powers of initiative and referendum." (Cal. Const., former art. 4, § 1; renumbered as former art. 4, § 23 in 1966; see *Rossi, supra*, 9 Cal.4th at p. 697, fn. 3.)

The more recent evolution of law differentiating between "tax" and "fees or charges" developed after the 1978 passage of Proposition 13, and Proposition 218 was adopted in 1996.

While user fees for water services are not "taxes" in the post-Proposition 13 era (Cal. Const., art. XIII C [voter approval for local tax levies], art. XIII D [property-related

16

fee reform]; *Bighorn, supra*, 39 Cal.4th at p. 217 [Proposition 218 allows use of initiative to challenge water delivery charges, which are fees or charges rather than taxes]), the question in this appeal is whether user fees constitute "tax levies" for purposes of the general referendum definition in article II, section 9, which predated Proposition 13.

The term "tax" can mean different things in different constitutional provisions. (*Bighorn, supra*, 39 Cal.4th at pp. 213-217.)  *Bighorn* noted that article XIII D, section 2, expressly defines "fee" and "charge" -- but "as used in this article" -- and therefore the definitions do not necessarily apply to article XIII C.  (*Bighorn, supra*, 39 Cal.4th at p. 213.)  On the other hand, because article XIII C and article XIII D were enacted together by Proposition 218, "it seems unlikely that the terms 'fee' and 'charge' were meant to carry *entirely* different meanings in those two articles, although some variation in meaning is possible." (*Bighorn, supra*, 39 Cal.4th at pp. 213-214, fn. omitted.)  "[I]t is possible that California Constitution article XIII C's grant of initiative power extends to some fees that, because they are not property related, are not fees within the meaning of article XIII D.  But we perceive no basis for excluding from article XIII C's authorization any of the fees subject to article XIII D." (*Bighorn, supra*, 39 Cal.4th at p. 216.)  *Bighorn, supra*, 39 Cal.4th 205, concluded that water delivery charges are fees under both article XIII D [property-related fee reform] and article XIII C, section 3, authorizing use of the initiative power to challenge fees. (*Id.* at pp. 216-217.)

Here, the word "tax" is used in different parts of different enactments.  The question is what does "tax" mean as used in the general referendum provision adopted in 1911.

When interpreting the California Constitution, "our aim is 'to determine and effectuate the intent of those who enacted the constitutional provision at issue.' [Citation.]" (*Bighorn, supra*, 39 Cal.4th at p. 212.)  We begin by examining the constitutional text, giving words their ordinary meanings. (*Ibid.* [where Constitution refers to "tax, assessment, fee or charge" in art. XIII C, court must, if possible, give

17

significance to the words "assessment, fee or charge" as meaning something other than "tax"].) Our role is to apply the provision according to its terms, not to read into it exceptions or qualifications that are not supported by its language. (*Ibid*.) If the language is unclear, we may look to extrinsic sources, including the ostensible objects to be achieved, evils to be remedied, legislative history, public policy, and contemporaneous administrative construction. (*Santos, supra,* 238 Cal.App.4th at p. 410.) We do not read the provision in isolation but harmonize it with the entire scheme to retain its effectiveness. (*Ibid*.) We presume the voters or legislators were aware of existing laws at the time the constitutional provision was adopted. (*Ibid*.)

In interpreting constitutional provisions regarding the referendum power, we are also guided by the rule that initiative and referendum powers are to be liberally construed to preserve the right to the people to vote on such measures. (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 267 (*Jacks*); *Rossi, supra*, 9 Cal.4th at p. 695.)

As indicated, the language of the provision is: "The referendum is the power of the electors to approve or reject statutes or parts of statutes *except* urgency statutes, statutes calling elections, and *statutes* [or local enactments] *providing for tax levies* or appropriations *for usual current expenses* of the State." (Cal. Const., art. II, § 9, subd. (a), italics added.)

"Levying" a tax includes both assessing and collecting it. (*City of San Luis Obispo v. Pettit* (1891) 87 Cal. 499, 503.)

"One of the reasons, if not the chief reason, why the Constitution excepts from the referendum power acts of the Legislature providing for tax levies or appropriations for the usual current expenses of the state is to prevent disruption of its operations by interference with the administration of its fiscal powers and policies." (*Geiger, supra*, 48 Cal.2d at pp. 839-840; see also, *Simpson v. Hite* (1950) 36 Cal.2d 125, 134 (*Simpson*) [referendum and initiative are unavailable where they would disrupt essential government functions].)

18

Additionally, it appears clear, and no one disputes, that Resolution 2015-19 is a legislative enactment arguably subject to referendum, as opposed to an administrative act. (*Simpson, supra*, 36 Cal.2d at p. 129 [county resolution designating site for courthouses was administrative act not subject to initiative].)

Before Proposition 13 made the distinction between tax and fees critical, the word "tax" generally had an inclusive definition that included exactions for assessment, fees or charges, including user fees for government services -- even where they conferred a special benefit on payors that was not conferred on other citizens. (*Yosemite Lumber Co. v. Industrial Acc. Commission of Cal., supra,* 187 Cal.at p. 783 [act exacting from employers a sum to be used for workers' compensation is in reality a tax under the definition that a tax " 'includes every charge upon persons or property, imposed by or under the authority of the legislature, for public purposes' "]; *Los Angeles County Flood Control Dist. v. Hamilton, supra,* 177 Cal. 119 ["In its broad meaning the word ['tax'] includes both general taxes and special assessments"].)

Thus, "[a] tax, in the general sense of the word, includes every charge upon persons or property, imposed by or under the authority of the legislature, for public purposes." (*City of Madera v. Black* (1919) 181 Cal. 306, 310 (*City of Madera*) [where an action to recover sewer rates was begun in "recorder's court," and an answer was filed showing that the determination of the action involved the legality of a tax, impost, and toll within the exclusive jurisdiction of the superior court, the recorder should have transferred the case to the superior court].) *City of Madera, supra*, 181 Cal. at page 310, is not directly on point because it found a tax where the money was used for general public purposes -- the traditional trademark of taxation. Nevertheless, our inquiry here is the "general sense" of the word "tax." (*Ibid.*)

*Fenton v. City of Delano* (1984) 162 Cal.App.3d 400, involved a referendum challenging a city ordinance imposing a "fee" on users of gas, electricity, phone, and cable television. The trial court found the utilities fee was a tax, and therefore could not

be challenged by referendum.  The appellate court agreed.  The question must be decided by the nature of the imposition, and not by the mere name by which it is called.  (*Id*. at p. 404.)  " 'There are many other instances where the word "tax" has been used to designate a special assessment.  [Citations.]'  [Citation.]  Black's Law Dictionary (5th ed. 1979) p. 1307, columns 1-2, makes the following comments regarding the difference between 'taxes' and 'assessments':  'In a broad sense, *taxes* undoubtedly include *assessments*, and the right to impose assessments has its foundation in the taxing power of the government; and yet, in practice and as generally understood, there is a broad distinction between the two terms.  "Taxes," as the term is generally used, are public burdens imposed generally upon the inhabitants of the whole state, or upon some civil division thereof, for governmental purposes, without reference to peculiar benefits to particular individuals or property.  "Assessments" have reference to impositions for improvements which are specially beneficial to particular individuals or property, and which are imposed in proportion to the particular benefits supposed to be conferred.  They are justified only because the improvements confer special benefits, and are just only when they are divided in proportion to such benefits.  As distinguished from other kinds of taxation, "assessments" are those special and local impositions upon property in the immediate vicinity of municipal improvements which are necessary to pay for the improvement, and are laid with reference to the special benefit which the property is supposed to have derived therefrom.' "  (*Fenton, supra*, 162 Cal.App.3d at p. 405.)

In concluding that the utilities charge was a tax and not a fee, *Fenton, supra*, 162 Cal.App.3d at page 405, cited with approval *Dare v. Lakeport City Council* (1970) 12 Cal.App.3d 864, 868 (*Dare*), which characterized a collection of fees for the maintenance of a sewer system as a tax.  *Dare* said, "[t]he imposition and collection of fees for the use of the facilities of [the sewer district] must reasonably be considered a taxation function.  'Taxes' are defined as burdens imposed by legislative power on persons or property to raise money for public purposes.  [Citations.]  And it has been

20

expressly held that a *monthly sewage rate* imposed by a municipal ordinance for the connection and use of sewers is a *tax*, impost and toll. [Citations.] And both *assessment*, i.e., 'the process of ascertaining and adjusting the shares respectively to be contributed by several persons toward a common beneficial object according to the benefit received' (Black's Law Dictionary (4th ed.), p. 149), and *collection*, are included in 'the operation called levying the tax. The words are so used in the [Constitution].' [Citation.]" Pursuant to the constitutional power of the Legislature to vest in public or municipal corporations the power to assess and collect "taxes," the Health and Safety Code enabled the legislative body of the municipal sewer district to "prescribe, revise and collect, fees, tolls, rates, rentals, or other charges for services and facilities furnished by it . . . ." (*Dare, supra*, 12 Cal.App.3d at pp. 868-869.)

Dare held that the *initiative* process was unavailable to amend a city council's determination of the manner of fixing charges for the use of sewer facilities, because allowing an initiative would undermine the prohibition against using the *referendum* power to challenge " 'statutes providing for tax levies or appropriations for usual current expenses of the State' " (Cal. Const., former art. IV, § 23) -- a prohibition which applies to county and municipal ordinances for "tax levies" (Cal. Const., former art. IV, § 25 [now art. II, § 11]). (*Dare, supra*, 12 Cal.App.3d at pp. 867, citing *Geiger, supra*, 48 Cal.2d 836.)

We recognize that *Dare, supra*, 12 Cal.App.3d at page 868, in considering the fee a tax, cited *City of Madera, supra*, 181 Cal. at page 310, which found a tax where the money was used for general public purposes -- the trademark of taxation. Nevertheless, cases such as *Dare* and *Fenton* are useful in their inclusive definition of "tax." Those cases are not on point. They held that, because the Constitution prohibits a referendum on taxes, neither may voters repeal a tax by an initiative because such an initiative would act as the functional equivalent of a referendum. (E.g., *Myers v. City Council of Pismo Beach* (1966) 241 Cal.App.2d 237; *City of Atascadero v. Daly* (1982) 135 Cal.App.3d

21

466; *Gibbs v. City of Napa* (1976) 59 Cal.App.3d 148; *Campen v. Greiner* (1971) 15 Cal.App.3d 836; *Dare, supra*, 12 Cal.App.3d 864.)  That holding is no longer good law, because it has been superseded by case law and constitutional amendment postdating Proposition 13.

Thus, the 1996 passage of Proposition 218 in effect abrogated the *Myers* line of cases by preserving the *initiative* power to repeal taxes (without changing the limitation on the referendum power), by adding to California Constitution, article XIII C, section 3, which states:  "Notwithstanding any other provision of this Constitution, including, but not limited to, Sections 8 [initiative power] and 9 [referendum power] of Article II, the *initiative* [italics added] power shall not be prohibited or otherwise limited in matters of reducing or repealing any local tax, assessment, fee or charge.  The power of initiative to affect local taxes, assessments, fees and charges shall be applicable to all local governments and neither the Legislature nor any local government charter shall impose a signature requirement higher than that applicable to statewide statutory initiatives."

By the time Proposition 218 was adopted in 1996, the California Supreme Court had already overruled the *Myers* line of cases (including *Dare*) in the March 1995 case of *Rossi, supra,* 9 Cal.4th 688, which held that the initiative power was available to voters to repeal a tax even though the referendum power was not-- though the *Rossi* decision was based in part on San Francisco's city charter.  (*Rossi,* at p. 693; see also, *Howard Jarvis Taxpayers Assn. v. City of Roseville* (2003) 106 Cal.App.4th 1178, 1188 [local taxes can be repealed by initiative, though not by referendum].)

*Rossi* did not disapprove or have reason to address the inclusive definition of "taxes" applied in the older cases.

An inclusive definition of "tax" is consistent with the general purpose of the constitutional exceptions in the general referendum provision – "urgency statutes, statutes calling for elections, and statutes providing for tax levies or appropriations for usual current expenses of the State."  (Cal. Const., art. II, § 9, subd. (a).)  This list of exceptions

22

is taken from the general Legislative provisions (Cal. Const., art. IV) for statutes that go into effect immediately upon their enactment. (Cal. Const., art. IV, § 8, subd. (c)(3) ["Statutes calling elections, statutes providing for tax levies or appropriations for the usual current expenses of the State, and urgency statutes shall go into effect immediately upon their enactment"].) A delay in implementation could disrupt essential governmental operations. (*Rossi, supra,* 9 Cal.4th at p. 703.) County ordinances fixing the amount of money to be raised by taxes and those fixing the tax rate go into effect immediately, while the effective date of other ordinances is delayed usually for a month. (*Ibid*., citing Elec. Code, §§ 9141-9143.) (Here, the Agency adopted Resolution July 21, 2015, with the new monthly rates to take effect August 1, 2015.) A valid referendum petition suspends the ordinance pending reconsideration and repeal of the ordinance by the local board or submission of the measure to the voters at a regular or special election, and the ordinance does not become effective unless and until a majority of voters approves it at the election. (*Ibid*., citing Elec. Code, §§ 9144, 9145.) "Therefore, if a tax measure were subject to referendum, the county's ability to adopt a balanced budget and raise funds for current operating expenses through taxation would be delayed and might be impossible. As a result, the county would be unable to comply with the law or to provide essential services to residents of the county." (*Rossi,* at p. 703.) "For that reason, when taxes levied to support essential governmental services arguably are involved in a referendum, the general rule requiring that referendum provisions be liberally construed to uphold the power is inapplicable. 'If essential governmental functions would be seriously impaired by the referendum process, the courts, in construing the applicable constitutional and statutory provisions, will assume that no such result was intended. [Citations.] One of the reasons, if not the chief reason, why the Constitution excepts from the referendum power acts of the Legislature providing for tax levies or appropriations for the usual current expenses of the state is to prevent disruption of its operations by interference with

23

the administration of its fiscal powers and policies.' " (*Rossi,* at p. 703, quoting *Geiger, supra*, 48 Cal.2d at pp. 839-840.)

The same reasoning applies to a local enactment adopting new water rates in order to keep providing water services which are clearly essential functions.

In response to this point -- which is made by amici curiae -- appellants argue that the Agency did not raise in the trial court, or present any evidence, that the delay in implementation resulting from the proposed referendum would greatly impair or destroy its ability to provide essential government functions. Appellants argue we should not entertain this matter because amici curiae cannot raise factual issues undeveloped in the trial court. However, appellants cite only an inapposite summary judgment case, which stands only for the proposition that review of summary judgment is limited to the facts presented in the trial court. (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163.) Moreover, the Resolution itself made a finding that the new rates were "necessary to cover the ongoing and increasing costs of providing water service" -- which appellants have not disputed -- and we can infer from this that inability to implement the new rates in August 2015 would be problematic.

An inclusive definition of "tax" has certainly changed for purposes of Proposition 13 and post-Proposition 13 developments in the law. Thus, "[o]ver the past four decades, California voters have repeatedly expanded voter approval requirements for the imposition of taxes and assessments. These voter initiatives have not, however, required voter approval of certain charges related to a special benefit received by the payor or certain costs associated with an activity of the payor. Whether the surcharge required voter approval hinges on whether it is a valid charge under the principles that exclude certain charges from voter approval requirements." (*Jacks, supra*, 3 Cal.5th at p. 257 [discussing whether electricity surcharge was tax or franchise fee].)

"Beginning in 1978, state voters have imposed various limitations upon the authority of state and local governments to impose taxes and fees. Proposition 13, which

24

was adopted that year, set the assessed value of real property as the 'full cash value' on the owner's 1975-1976 tax bill, limited increases in the assessed value to 2 percent per year unless there was a change in ownership, and limited the rate of taxation on real property to 1 percent of its assessed value. (Cal. Const., art. XIII A, §§ 1, 2.) In addition, to prevent tax savings related to real property from being offset by increases in state and local taxes, Proposition 13 required approval by two-thirds of the members of the Legislature in order to increase state taxes, and required approval by two-thirds of the local electors of a city, county, or special district in order for such a local entity to impose special taxes. [Citations.]" (*Jacks, supra*, 3 Cal.5th at p. 258.) Proposition 13 did not define "special taxes," but case law and statute have construed the term to include taxes levied for a specific purpose but to exclude "any fee which does not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged and which is not levied for general revenue purposes." (*Jacks, supra*, 3 Cal.5th at p. 258, citing Gov. Code, § 50076 [special tax does not include fee not levied for general revenue purposes that does not exceed reasonable cost of providing service].)

Thereafter, in 1986, voters approved Proposition 62, which added Government Code sections 53720 to 53730, requiring that all new local taxes by any district (not just special districts) be approved by a vote of the local electorate. (*Jacks, supra*, 3 Cal.5th at p. 258.) By then, courts as well as the Legislature had recognized that various fees were not taxes for Proposition 13 purposes. (*Id*. at p. 259.)

Next, in 1996, voters approved Proposition 218, known as the "Right to Vote on Taxes Act," which among other changes, imposed restrictions on the imposition of fees and charges for property-related services, such as sewer and water services, while also providing that fees for electrical or gas service shall not be deemed charges or fees imposed as an incident of property ownership. (*Jacks, supra*, 3 Cal.5th at pp. 259-260 & fn. 3, citing Cal. Const., art. XIII C and XIII D.) Proposition 218 added to the California Constitution, article XIII C, requiring voter approval before local government could

25

impose or increase local government "taxes." (Cal. Const., art. XIII C, § 2.) Proposition 218 also added article XIII D calling for voter approval before local government could impose or increase property-related fees and charges, "[e]xcept for fees or charges for . . . water . . . services [and sewer and refuse collection]." (Cal. Const., art. XIII D, § 6, subd. (c).) "Fee" or "charge" means any levy other than an ad valorem tax, special tax, or assessment, imposed by an agency upon a parcel or person as an incident of property ownership, including a user fee or charge for a property-related service having a direct relationship to property ownership. (Cal. Const., art. XIII D, § 2, subds. (e), (h).) Proposition 218 instituted a pre-enactment protest procedure that could stop a proposed fee increase for property-related fees and charges if a majority of owners presented written protests. (Cal. Const., art. XIII D, § 6.) And Proposition 218 authorizes the *initiative* power, but not the referendum power, to reduce or repeal "any local tax, assessment, fee or charge. . . ." (Cal. Const., art. XIII C, § 3.)

Most recently, in 2010 voters approved Proposition 26, which amended the Constitution to provide that for purposes of article XIII C (voter approval of local taxes), "tax" means " 'any levy, charge, or exaction of any kind imposed by a local government' " *except* (1) a charge imposed for a specific benefit or privilege received only by those charged, which does not exceed its reasonable cost, (2) a charge for a specific government service or product provided directly to the payor and not provided to those not charged, which does not exceed its reasonable cost, (3) charges for reasonable regulatory costs related to the issuance of licenses, inspections, etc., (4) charges for access to or use of government property, (5) fines for violations of law, (6) charges imposed as a condition of developing property, and (7) property-related assessments and fees as allowed under article XIII D. (*Jacks, supra*, 3 Cal.5th at p. 260, citing Cal. Const., art. XIII C, § 1, subd. (e).)

Thus, the term "tax" has developed a more restrictive meaning after Proposition 13.

But we see no reason, and no one offers a reason, to apply the new narrower definition of "tax" to the general referendum power. In construing the general provision, we do not read it in isolation but harmonize it with the entire scheme to retain its effectiveness. (*Santos, supra*, 238 Cal.App.4th at p. 410.) Our expansive construction of "tax" in the general provision barring referendum for water service fees is in harmony with Proposition 13 law exempting water service fees from a requirement of pre-enactment voter approval. (Cal. Const., art. XIII D, § 6, subd. (c).) Thus, post-Proposition 13 law allows local government more flexibility for water fees (which are not subject to pre-approval by voters) than for taxes and other charges that are subject to pre-approval by voters. (Cal. Const., art. XIII C, art. XIII D, § 6, subd. (c).)

Moreover, citizens today can still challenge water user rates by using the pre-enactment majority protest procedure established by Proposition 218 in 1996 (Cal. Const., art. XIII D, § 6) or by using the initiative power (Cal. Const., art. XIII C, § 2).

Because we conclude the term "taxes" in the general referendum provision (Cal. Const., art. II, § 9) includes user fees for water services, Resolution 2015-19 is not subject to referendum, and we need not address the Agency's arguments that Proposition 218 implicitly repealed the power of referendum.

As indicated, the power of referendum is one of the most precious rights of our democratic process; courts have long applied a liberal construction to this power whenever it is challenged in order that the right be not improperly annulled. (*Alliance, supra*, 108 Cal.App.4th at p. 135.) If doubts can reasonably be resolved in favor of the use of this power, courts will preserve it. (*Ibid.*)

Here, we have no doubt that the exclusion of "taxes" from the general constitutional referendum power broadly encompassed exactions for usual current expenses of government, regardless of their label as taxes, fees, or charges. The statutory right to referendum (Water Code App., § 95-7.3) cannot afford greater rights than the constitutional provision. (*Geiger, supra*, 48 Cal.2d at p. 837.)

27

Accordingly, Resolution 2015-19 setting new water rates is not subject to referendum, and the trial court's denial of the writ petition was proper.

DISPOSITION

The judgment is affirmed. Because we affirm on grounds other than those raised by the Agency in its respondent's brief on appeal, we exercise our discretion to have the parties bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)


　　　　　　　　　　　　　　 s/HULL　　　　　　, J.


I concur:


　　 s/BLEASE　　　　, Acting P. J.

Murray, J., Concurring.

While I concur in the majority's opinion, I write separately to note two differences between this case and *Wilde v. City of Dunsmuir* (2018) 29 Cal.App.5th 158 (*Wilde*).

First, in *Wilde*, the city's resolution changing water service rates included a major upgrade of the city's water delivery infrastructure. As we noted, "The new water rates are the product of a newly formulated set of policies that implemented a new set of choices: to replace a 105-year-old water storage tank as well as selected old water mains. [The plan] also represents policy choices about how to allocate the new infrastructure costs." (*Wilde*, *supra*, 29 Cal.App.5th at p. 174.) The proposed referendum challenged the entire resolution and "would have had the effect of reverting to the City's 1994 Water Rate Master Plan. [The] referendum would have prospectively cancelled the City's newly adopted master plan to spend $15 million on infrastructure and reallocation of water costs." (*Id.* at pp. 176-177.)

Thus, the *Wilde* referendum challenged both the new levy and the proposed infrastructure plan — not simply a statute providing "for tax levies or appropriations for usual *current expenses* of the State." (Cal. Const., art. II, § 9, subd. (a), italics added.) Indeed, as we said in *Wilde*, "the fact that [the resolution] includes a financial component does not insulate it from challenge by voter referendum. The resolution does not represent the ordinary working or budgeting of the City." (*Wilde*, *supra*, 29 Cal.App.5th at p. 178.) Here, by contrast, the proposed referendum challenges only a new rate plan.

Second, in *Wilde*, we did not address the question of whether the water service charge was a tax because the parties had agreed it was a fee, not a tax. (*Wilde*, *supra*, 29 Cal.App.5th at p. 172, fn. 3.) This seemed consistent with my view that the *Wilde* referendum did not solely challenge a levy for the "usual current expenses" (Cal. Const., art. II, § 9, subd. (a)), but also effectively rejected the proposed changes to the water delivery infrastructure.

1

Thus, while the bottom line conclusion we reach in this case differs from that in *Wilde*, as the majority so states (Maj. opn., *ante*, p. 3), it is different because we address an argument the parties appropriately took off the table in *Wilde* because that case involved two components:  a financial component reflected in water rate changes, and a new service delivery component, not part of the "current expenses" of the city.

                                    s/MURRAY          , J.

2